## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHERI BENTZ,

        Plaintiff,

v.

CITY OF MARION, KANSAS

MARION MAYOR DAVID MAYFIELD,
in his official and individual capacities,

FORMER CHIEF GIDEON CODY,
MARION, KANSAS POLICE DEPARTMENT
in his official and individual capacities,

ACTING CHIEF ZACH HUDLIN,
MARION, KANSAS POLICE DEPARTMENT
in his individual capacity,

SHERIFF JEFF SOYEZ,
MARION COUNTY SHERIFF'S OFFICE
in his official and individual capacities,

and

DETECTIVE AARON CHRISTNER,
MARION COUNTY SHERIFF'S OFFICE,
in his individual capacity,

        Defendants.

Case No.

## <u>COMPLAINT</u>

        COMES NOW the plaintiff, CHERI BENTZ, through her undersigned counsel of record, and in support of her claims against the CITY OF MARION, KANSAS; MARION MAYOR DAVID MAYFIELD; FORMER MARION POLICE CHIEF GIDEON CODY; ACTING MARION POLICE CHIEF ZACH HUDLIN; MARION COUNTY SHERIFF JEFF SOYEZ; and DETECTIVE AARON CHRISTNER, (collectively "Defendants"), hereby states and alleges as follows:

1

**FACTUAL BACKGROUND**

1.      Cheri Bentz has worked as the office manager with the *Marion County Record* since 2018. The *Record* is a weekly newspaper in Marion, Kansas. Marion has a population of about 1,900.

2.      As office manager, Bentz ensures that the office runs smoothly on a day-to-day basis, performing tasks that are vital to the *Record*'s newsgathering operations, including payroll and fixing technical issues on staff computers.

3.      On Friday, August 11, 2023, Bentz was going about the daily tasks associated with her job and preparing to run payroll for the newspaper's staff.

4.      Bentz was sitting at her desk and tending to her work tasks, lawfully and peaceably, when the Chief of the local police department, Gideon Cody, accompanied by a swarm of other city and county law-enforcement officers, entered the building armed with a defective search warrant that unconstitutionally targeted the *Record* and its staff in retaliation for their lawful, protected newsgathering activities.

5.      Cody approached Bentz from behind, startling her, and made her leave her desk and personal belongings while the police department and Marion County Sheriff's office staged an unprecedented, retaliatory raid on the *Record* and its staff. Bentz was detained, made to stand outside in sweltering heat, and subjected to a custodial interrogation, simply because of her work on behalf of a news organization.

6.      Bentz now seeks justice and accountability for Defendants' violations of her constitutional rights.

**Background on the Raid**

7.      Facts that have come to light since the time of the raid make clear that local law

enforcement and community leaders had a vendetta against the *Record* because of its critical reporting and scrutiny of local public affairs.

8.      For example, the *Record* was investigating allegations made against Chief Cody while he worked for the Kansas City, Missouri (KCMO) Police Department prior to taking a job as the Marion Police Chief.

9.      Cody had responded by discontinuing the long-standing practice of providing weekly police activity reports, withholding information on pay scales that was subject to the Kansas Open Records act, instructing other law enforcement personnel not to speak with the *Record,* and trying to recruit reporter Phyllis Zorn to start a competing publication, claiming that the *Record* staff was too "negative."

10.     The *Record* had also drawn the ire of the former mayor of Marion, David Mayfield, writing various editorials critical of Mayfield and his unsuccessful 2022 campaign to recall vice mayor Ruth Herbel.

11.     In a February 8, 2023, Facebook post, Jami Mayfield, David Mayfield's wife, said that the recall effort was also intended to "silence the MCR" (the *Marion County Record*) because, in her view, the Record had published "way more information than was necessary to report 'news.'"

12.     David shared Jami's post that same day.

13.     In June 2023, the recall effort failed because it did not garner enough signatures.

14.     In July 2023, Mayfield posted on Facebook that "[t]he real villains in America . . . are the radical 'journalists,' 'teachers,' and 'professors' who do nothing but sow division between the American people," alluding to the *Record*, and publisher Eric Meyer in particular, who previously worked as a professor of journalism for 25 years at the University of Illinois Urbana-

Champaign.

15.     On August 1, 2023, U.S. Rep. Jake LaTurner, who represents Marion as part of Kansas' Second Congressional District, held a "town hall" event in Marion to which the *Record* was specifically invited.

16.     The town hall was held at Kari's Kitchen, a coffee shop owned by local resident Kari Newell, located inside the Elgin Hotel.

17.     Newell, who herself had a grudge against the *Record* and one of its reporters, asked Police Chief Cody to expel the *Record's* staff from the town-hall event, which he did.

### News Tip About Kari Newell Turns Into Criminal Investigation of the *Record*

18.      On August 2, 2023, the day after Rep. LaTurner's event at Kari's Kitchen, *Record* reporter Phyllis Zorn received an anonymous tip via Facebook Messenger stating that Newell did not have a valid driver's license because of a prior DUI.

19.     The tipster also said that law enforcement was aware that Newell did not have a license.

20.     The tipster attached a copy of an August 1, 2023, letter from the Kansas Department of Revenue ("KDOR") addressed to Newell, which explained what steps Newell was required to take to have her driver's license restored.

21.     The KDOR letter included Newell's full name, address, date of birth, and driver's license number.

22.     On August 3, 2023, publisher Meyer and reporter Zorn used the Kansas Driver's License Status Check, a publicly available Kansas government website, to verify the legitimacy of the information in the letter.

23.     Verifying information using publicly accessible government databases is a

routine, lawful, necessary, and ethical practice in journalism.

24.     Under Kansas law, driver's license records are subject to the Kansas Open Records Act: "All motor vehicle records shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b). "Motor vehicle records" includes "any record that pertains to a motor vehicle drivers' license." K.S.A. 74-2012(a)(3).

25.     Despite determining that the document about Newell was legitimate, the *Record* decided not to publish an article about it in the *Record*.

26.     Instead, on August 4, 2023, Publisher Eric Meyer himself notified Cody and Marion County Sheriff Jeff Soyez via email that the *Record* had received information related to a "Marion businesswoman" from a confidential source.

27.     While noting the importance of source confidentiality, Meyer indicated a willingness to cooperate with law enforcement if Cody or Soyez had "cause to believe some crime or misbehavior might have occurred and additional information we might be able to provide could assist in any investigation."

28.     Neither Cody nor Soyez ever responded to the email. Rather, the City of Marion, with assistance from the Sheriff's Office, began a criminal investigation of the *Record*, under the false pretext that there had been an identity theft, or unlawful use of a computer, to obtain the factual public information about the status of Newell's driving record.

29.     Also on August 3, Vice Mayor Herbel sent a copy of the same KDOR letter that Zorn had received to City Administrator Brogan Jones.

30.     In the email, Herbel said she received the document from Marion resident Pam

Maag, who has since confirmed that she sent the document to the *Record*.

31.     On August 4, Jones notified Mayor Mayfield about the KDOR letter and his communication with Herbel but also stated that the "Chief/PD will not be looking into this" because the State of Kansas was the proper government entity for such oversight. Jones continued, "We as a city need to stay out of this."

32.     On August 7, Jones forwarded Herbel's email with the KDOR letter attached to Mayfield and the other council members (without Herbel included as a recipient).

33.     That same day, Mayfield and councilmember Zach Collett contacted Newell, told her that Herbel knew about Newell's DUI, and baselessly claimed Herbel was planning to use the DUI as a reason not to grant Newell a liquor license she was applying for in order to serve alcohol at her restaurant, Chef's Table.

34.     Mayfield also added that the only way he could remove Herbel from the City Council was if Herbel were convicted of a crime.

35.     The Marion City Code states that the Mayor "shall … [h]ave superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

36.     Pursuant to this authority, Mayfield overruled City Administrator Jones' decision not to investigate the KDOR letter incident.

37.     Mayfield, thus, authorized Chief Cody to investigate Herbel and the *Marion County Record*.

38.     Cody contacted Newell and falsely told her that a reporter at the *Record* had stolen her identity, used it to access her driving records, and shared the record with Herbel.

39.     Upon information and belief, Cody made this statement even though he knew Pam Maag was the tipster who had shared the record with Herbel.

40.     Later that same day, August 7, Newell attended a city council meeting that was intended to address her request for a liquor license.

41.     At the meeting, Newell repeated the allegations she had heard from Mayfield, Collett, and Cody, including the allegation that a *Record* reporter illegally obtained the information and provided it to Herbel.

42.     Publisher Eric Meyer, who was there on behalf of the *Record* to report on the council meeting, stood up and said that no one from the *Record* had sent the KDOR letter to Herbel.

43.     Nonetheless, after the council meeting, Marion County Sheriff Jeff Soyez and Marion County Sheriff's Office Detective Aaron Christner joined the investigation of Herbel and the *Record*.

44.     From August 8 through August 10, Christner and Cody drafted search warrants targeting the *Record* office, Herbel's house, Maag's house, and the Meyers' house, and reviewed the warrants with Soyez.

45.     Although Sheriff's detective Christner did not ultimately sign a search warrant application, he actively participated in the investigation that led up to the raid and wrote the initial draft of the search warrant application for the *Record* newsroom, before sending it to Cody to finalize.

46.     Marion County Attorney Joel Ensey's office then delivered applications for the search warrants to Magistrate Judge Laura Viar for approval.

### Newsroom Raid Based on Defective Search Warrants

47.     Kansas law provides that a search warrant may only be issued "upon the oral or written statement . . . of any person under oath or affirmation." K.S.A. 22-2502(a).

48.     Pursuant to this requirement, the search warrant applications each contained a spot

for notarization.

49.     However, Judge Viar struck through the word "Notary" on the applications.

50.     Moreover, although the applications were signed by Cody, Cody was not present when the applications were delivered to Judge Viar.

51.     Nonetheless, Judge Viar approved the applications with her signature next to a statement that Cody had "SUBSCRIBED and SWORN to" the application "before me."

52.     This self-notarization by Judge Viar is invalid under Kansas law, which states: "If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the signature shall appear personally before the notarial officer." K.S.A. 53-5a606(a).

53.     As stated, Cody was not personally before Judge Viar when she signed the applications.

54.     On Friday, August 11, 2023, Chief Cody spearheaded a team of armed law enforcement officers in conducting raids on the offices of the *Marion County Record*, the home of Eric Meyer and his mother, Joan Meyer (the newspaper's co-owner), and the home of Ruth Herbel.

55.     The raids were conducted pursuant to the invalid search warrants which Chief Cody had obtained under false pretenses.

56.     The first raid occurred at the offices of the *Record*, where Chief Cody led an armed squad consisting of himself, Marion police officer Zach Hudlin, Marion police officer Jonathan Benavidez, Sheriff's detective Christner, and Marion County Sheriff's detective Steven Janzen.

57.     The officers approached the building from the rear, where they confronted *Record* reporters Phyllis Zorn and Deb Gruver.

58.     Chief Cody forcibly snatched Gruver's phone from her hand.

59.     Chief Cody then led the officers into the office, where they encountered Bentz.

60.     The officers approached Bentz from behind and startled her.

61.     As Chief Cody approached Bentz, he told her that the officers were conducting a search warrant.

62.     Shocked, Bentz asked, "Here? What kind of search warrant?"

63.     Without further explanation, Chief Cody instructed Bentz to go outside and asked if she has left "all of [her] electronic devices" inside the newsroom—to which she responded affirmatively.

64.     Chief Cody then told the *Record* staff, who were standing outside the newsroom, "I'm going to speak to every one of you—everybody individually to let you know what we're looking for specifically, and then if we get what we're looking for then we're just going to return everything back." He then added, falsely, "The search warrant covers us *recovering everything*. I'd rather not have to, okay, but if I don't get the cooperation, and I can't find what I'm looking for …" before trailing off and ordering *Record* reporter Phyllis Zorn inside for questioning. (Emphasis added).

65.     After Chief Cody questioned Zorn and *Record* reporter Deb Gruver, Officer Hudlin called Bentz inside for questioning.

66.     Officer Hudlin, who was standing by Cody adding to the show of force against the *Record* and its staff, then read Bentz her Miranda rights.

67.     Chief Cody told Bentz they were looking for devices that were used to download Kari Newell's driving records.

68.     Bentz explained that, as the office manager, she was not directly involved in reporting and that her computer was used primarily for accounting purposes and some minor

rewrites.

69.     Chief Cody then responded, "That was easy. And you don't know of anybody that downloaded the information, which computers that might be on or anything like that? Would you tell me if you did? Probably not."

70.     Bentz responded, "Honestly, I have no idea because what they do—I have no idea. And usually, my job is if they're having problems with the computer, I fix it, or I take care of the things, what needs to be done. That's it."

71.     Chief Cody then acknowledged that he did not think Bentz was involved in any alleged crime: "Perfect. I think you have very little involvement in it from the sounds of you."

72.     After some more back and forth, in which Bentz let the officers know the raid was "a waste of [her] flipping time" and "a pain in the ass," Hudlin escorted Bentz back outside into the heat.

73.     Fearing law enforcement would leave the newsroom unlocked after concluding their search, Bentz remained outside the newsroom for several more hours until the search was over and *Record* staff were allowed back in the building.

74.     After officers were unable to identify any evidence of alleged identity theft using preview searches on the newsroom's electronics, Sheriff Jeff Soyez told Chief Cody to "just take them all," prompting law enforcement to empty the newsroom of much of its electronic equipment.

75.      In short, Bentz was detained, interrogated, separated from her belongings, and treated like a criminal suspect for simply doing her job in furtherance of the *Record's* protected First Amendment activity.

76.     As a result of the raid and the actions of law enforcement set out herein, Bentz has lost sleep, has seen her daily quality of life diminish, has seen her social relationships impacted,

and has faced aggravated health conditions.

## Count I

### First Amendment – Direct Violation (42 U.S.C. § 1983)

### (Former Chief Cody, Acting Chief Hudlin, Sheriff Soyez, and Detective Christner)

77.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs.

78.    The First Amendment to the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of … of the press."

79.    The Fourteenth Amendment to the United States Constitution extends the protections of the First Amendment to actions taken by local governments and by local government officials.

80.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record*, it was clearly established that the First Amendment guaranteed the freedom of the press to gather and report information about matters of public concern.

81.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record*, it was clearly established that the First Amendment prohibited government officials, including the police and sheriff's deputies, from interfering with the freedom of the press to gather and report information about matters of public concern.

82.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record*, it was clearly established that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

83.    The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

84.     When the newsroom of the *Marion County Record* was raided, Defendants knew that Eric Meyer, Joan Meyer, Phyllis Zorn, Deb Gruver and Bentz were all engaged in the business of gathering and reporting information on matters of public concern, and that the *Record* itself is a newsgathering organization.

**The Search Warrant Was Not "Issue[d] … Upon Probable Cause"**

85.     When the newsroom of the *Marion County Record* was raided, Defendants, including Sheriff's Detective Christner as the drafter of the initial newsroom search warrant application and Chief Cody as its signor, did not have an objectively reasonable belief that anyone associated with the *Record*, particularly Bentz, was in possession of contraband, fruits, instrumentalities, or evidence of any crime.

86.     No probable cause existed to issue the search warrants for the *Marion County Record* newsroom.

87.     The search warrants were issued based on materially false statements of fact by Chief Cody with direct assistance from Sheriff's Detective Christner, including, but not limited to, the following:

a.      the federal Driver's Privacy Protection Act applied to the August 1, 2023, letter from the Kansas Department of Revenue to Kari Newell;

b.      in order to access a copy of the letter someone from the Record had to "l[ie] about the reasons why the record was being sought;"

c.      in order to use the Kansas Driver's License Status Check tool a user has to provide

a reason (or reasons) for accessing the information;

d.       in order to use the Kansas Driver's License Status Check tool a user has to "show a legal reason to obtain the information according to the Driver's Privacy Protection Act of 1994;"

e.       the Kansas Driver's License Status Check tool states: "Under the Driver's Privacy Protection Act of 1994, as amended (DPPA) (18 U.S.C. § 2721), personal information obtained by the Kansas Department of Revenue cannot be released unless the request for information falls within one of the exceptions within the Act;" and

f.       the Kansas Driver's License Status Check tool states: "By proceeding past this screen, I declare that I am eligible and have the express authority to receive the requested information pursuant to the Federal Driver's Privacy Protection Act of 1994, as amended. I further declare that any personal information I received will not be used to sell or offer for sale any property or service."

88.     The true facts are that the Kansas Driver's License Status Check tool on the Kansas Department of Revenue's website is available for anyone to use.

89.     The Kansas Driver's License Status Check tool does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site.

90.     The Kansas Driver's License Status Check tool is not covered by the Driver's Privacy Protection Act.

91.     The federal Driver's Privacy Protection Act protects what the statute calls "personal information." 18 U.S.C. § 2721(a)(1).

92.     The Driver's Privacy Protection Act explicitly states that "personal information" "does not include information on vehicular accidents, driving violations, and *drivers' statu*s." 18

U.S.C. § 2725(3) (emphasis added).

93.     Thus, the Kansas Driver's License *Status* Check tool on the Kansas Department of Revenue's public-facing website is not covered by the Driver's Privacy Protection Act.

94.     Chief Cody (who signed the search warrant applications) and Sheriff's detective Christner (who drafted the substance of the applications) either knew the statements made in the applications were false or acted with reckless disregard for whether they were false.

95.     Chief Cody and detective Christner made these false statements for the purpose of inducing Magistrate Judge Viar to issue the search warrant for the newsroom of the *Marion County Record* and other locations.

96.     Magistrate Judge Viar issued the search warrant for the newsroom of the *Marion County Record* based on these materially false statements.

97.     Thus, the search warrant was not "issue[d] … upon probable cause," as required by the Fourth Amendment.

98.     As such, the search warrant was invalid and void.

**The Search Warrant Was Not "Supported by Oath or Affirmation"**

99.     The search warrant application for Bentz's place of work, the *Record,* had a space for a notary to sign the application.

100.    However, on the application, Judge Viar scratched out "Notary" and signed the applications herself, attesting that Chief Cody swore the applications had been "SUBSCRIBED and SWORN to *before me.*" (Emphasis added).

101.    But Chief Cody never appeared before Magistrate Viar, making Judge Viar's statement that Cody swore to the applications "before me" false.

102.    Judge Viar's act of notarizing the applications was invalid under Kansas law,

which provides as follows: "If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the signature shall appear *personally* before the notarial officer." K.S.A. 53-5a606 (a) (emphasis added).

103.    Accordingly, the search warrant was not issued "upon oath or affirmation," as required by the Fourth Amendment.

104.    As such, the search warrant was invalid and void.

### The Search Warrant Was Overbroad

105.    The search warrant for the *Record*'s newsroom did not "particularly describ[e] the place to be searched, and the persons or things to be seized."

106.    This is particularly troubling given the U.S. Supreme Court's explicit direction that "[w]here presumptively protected materials [under the First Amendment] are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." *Zurcher v. Stanford Daily*, 436 US. 547, 564 (1976); *id* at 565 ("the warrant requirement [should be applied] with particular exactitude when First Amendment interests would be endangered by the search").

107.    For example, the search warrants authorized the seizure of "[d]ocuments and records pertaining to Kari Newell," as well as "[c]orrespondence or other documents (whether digital or written) pertaining to Kari Newell."

108.    Newell was a prominent local businessperson in Marion and, as such, she would be the subject of numerous materials held by the Record that have nothing to do with the alleged crimes of identity theft and unauthorized use of a computer.

109.    The search warrants also authorized the seizure of "[d]igital software and application software installation and operation media."

110.     Such a search topic is plainly overbroad; for example, the *Record*'s software for creating mailing labels for its subscribers has nothing to do with the alleged crimes of identity theft and unauthorized use of a computer.

111.     The search warrants also authorized the seizure of "[d]igital storage media and the digital content which are, or have been, used to store documents and items of personal information as defined by K.S.A. 21-6107."

112.     K.S.A. 21-6107 defines "personal identifying information" as including "[n]ame."

113.     K.S.A. 21-6107 also defines "personal identifying information" as including "address."

114.     K.S.A. 21-6107 also defines "personal identifying information" as including "credit or debit card information."

115.     Thus, every computer hard drive or portable storage device which includes subscribers' "name," "address" and "credit or debit card information" (which are used to mail and pay for subscriber's subscription) was subject to seizure.

116.     As a result, such a search violates not only the freedom of the press clause of the First Amendment, it violates the First Amendment right of association as well. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).

**Seizure Exceeded the Scope of the Warrant**

117.     Prior to the August 11, 2023, raids on the newsroom of the *Marion County Record*, it was clearly established that the Fourth Amendment prohibited the government, including the police, from conducting warrantless raids on a person's home or a corporation's offices except in strictly limited circumstances, such as exigent circumstances, with consent of the property owner, an item is plain view, etc.

118.    No exceptions to the warrant requirement applied to the August 11, 2023, raids on the newsroom of the *Marion County Record*.

119.    Yet numerous items were seized which were not listed on the search warrant.

120.    For example, the search warrant authorized the seizure of "[a] computer or digital device that has been used to access the Kansas Department of Revenue records website."

121.    The search warrant also authorized the seizure of "[d]igital communications devices allowing access to the Internet or to cellular digital networks which were or have been used to access the Kansas Department of Revenue records website."

122.    Despite the requirement that any such device "has/have been used" to access the Kansas Department of Revenue website, computers and cell phones were seized that had never been used to connect to the Kansas Department of Revenue's records website.

123.    For example, Chief Cody ensured that Bentz had left her electronic devices in the *Record* newsroom when he forced her to wait outside in the sweltering heat, despite Bentz not being implicated in any potential identity theft.

124.    Bentz left her cellphone in the newsroom for the duration of the raid.

125.    Even after informing law enforcement that her cellphone was only used for personal matters, the Marion police officers and Sheriff's deputies orchestrating the search did not allow Bentz to retrieve it until the raid concluded.

126.    The warrants also required the officers to conduct "preview searches" on devices to determine which devices were allegedly used for identity theft.

127.    Yet law enforcement seized computers and cellphones used by Gruver, Meyer, and Zorn, despite preview searches failing to indicate any of the devices had been used for alleged identity theft.

128.     Such warrantless seizures were done without consent of any person, no exigent circumstances existed, and no other exception to the warrant requirement applied.

129.     Such "rummag[ing] at large in newspaper files" is plainly unconstitutional. *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978).

### The Marion County Attorney Withdraws the Search Warrants

130.     On Wednesday, August 16, 2023, Marion County Attorney Joel Ensey filed a motion to release the evidence seized during the raids, which Chief District Court Judge Benjamin Sexton granted the same day.

131.     At the same time he filed his motion, County Attorney Ensey issued a press release stating that "insufficient evidence" exists "to establish a legally sufficient nexus" between any crime local law enforcement had been investigating and "the places searched and the items seized."

132.     The press release stated that Marion County Attorney Ensey was asking local enforcement to return the items seized to their owners.

133.     Thus, even the County Attorney agrees "the places searched and the items seized" exceeded the allowable scope under the Fourth Amendment.

### The Raids Interfered with the Freedom of the Press

134.     Defendants' seizure of *Record* computers and electronic devices as well as *Record* staff cellphones, including Bentz's cellphone during the raid, incapacitated the *Record* and thus violated the freedom of the press.

135.     Because the Record's network server was seized, the Record's page layouts, advertisements, even the newspaper nameplate (the title of the newspaper on the front page)— were inaccessible.

136.     The Record had to cobble together a patchwork computer network from borrowed

and otherwise obsolete computers in an attempt to publish the weekly print edition of the newspaper.

137.     That effort required back-to-back all-nighters, during which the staff was unable to gather and report on other news events.

138.     Moreover, on the day of the raid, Bentz was scheduled to complete the payroll for the pay period.

139.     The raid precluded Bentz from timely completing payroll, further inhibiting *Record* employees' ability to do their jobs.

### Harm to Cheri Bentz

140.     Bentz was also personally harmed by Defendants' First Amendment violations.

141.     Specifically, following the raid, Bentz has lost sleep, has seen her daily quality of life diminish, has seen her social relationships negatively impacted, and has faced aggravated health conditions.

142.     Moreover, the raid would chill an ordinary person from exercising their freedom of speech.

143.     Indeed, the raid has had a chilling effect on Bentz exercising her First Amendment freedom of speech.

144.     Bentz has also reduced her workload with the *Record* because of the significant emotional toll of the raid, thus inhibiting the *Record*'s ability to exercise its First Amendment protected functions as a news organization.

145.     Moreover, Officer Hudlin, who played a large role in the raids, has been appointed Acting Chief of Marion Police, leaving lingering concerns for all *Record* staff, including Bentz.

**The Defendants' Malicious and Wanton Actions**

146.     Defendants acted maliciously and wantonly in violating the First Amendment rights of the *Record* and its staff.

147.     Defendants' actions were prompted by ill will or spite towards the *Record*, as evidenced, for example, by Chief Cody's repeated prior actions to harass the Record, including removing Eric Meyer and Phyllis Zorn from the "open" meet and greet for Rep. LaTurner, offering to fund a competing newspaper, and refusing to provide clear open records to the *Record*.

148.     Defendant's actions demonstrate a conscious desire to violate the constitutional rights of the *Record* and its employees, as well as an awareness of the consciousness of their guilt, such as when they tried to hide their illegal activities.

149.     For example, when law enforcement returned the illegally seized devices after the raid, Sheriff Soyez told *Record* reporter Zorn, "You didn't see me over there."

150.     While it is true that Sheriff Soyez was not personally at the raids, he helped coordinate and direct the raids, including telling Chief Cody to take all of the *Record*'s electronic devices after the preview searches failed. Further, he ratified his employees' activities in coordinating and orchestrating the raid, including by meeting with Cody afterward to enjoy pizza and recap the raid, and pointing out to Cody that his body camera was still operating (which Cody promptly then had turned off).

151.     Additionally, Chief Cody told Marion resident Kari Newell to delete text messages between the two of them after the raid.

**Official Policies**

152.     The Marion City Code gave Chief Cody sole "power to make such rules and regulations as may be necessary for the proper and efficient conduct of the department," Code of

the City of Marion, Kan. § 10-103.

153.     Accordingly, Chief Cody's actions constitute an official municipal policy of the City of Marion.

154.     In Kansas, the Sheriff is a separately elected official whose term, duties, training and authorities are established by statute, not the Board of County Commissioners. *Board of County Commissioners v. Nielander*, 275 Kan. 257 (2003); K.S.A 19-801a, et. seq.

155.     Boards of County Commissioners have no oversight over the Sheriff or the operation of his office. *Blume v. Meneley*, 283 F. Supp. 2d 1171, 1174-75 (D. Kan. 2003).

156.     Accordingly, Sheriff Soyez's actions constitute an official policy of the Marion County Sheriff.

## Count II

## First Amendment – Retaliation (42 U.S.C. § 1983)

## (City of Marion, Mayor Mayfield, and Former Chief Cody)

157.     Plaintiff realleges and incorporates by reference paragraphs 1 through 156.

158.     The First Amendment to the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of speech, or of the press."

159.     The Fourteenth Amendment to the United States Constitution extends the protection of the First Amendment to actions taken by local governments and by local government officials.

160.     Prior to the August 11, 2023, raids on the newsroom of the *Marion County Record*, it was clearly established that the government, including the police, cannot retaliate against a person for engaging in protected activity under the First Amendment.

161.     Prior to the raids, the *Marion County Record* had published numerous reports,

columns, and editorials about Marion city government generally, about Mayor Mayfield specifically, and about Chief Cody.

162.    Additionally, the Record had been investigating Chief Cody's prior employment with the Kansas City, Missouri Police Department.

163.    Each of these activities is a protected First Amendment activity.

164.    Both Mayor Mayfield and Chief Cody were incensed over these activities, and both verbalized an intent to seek retribution against the Record and its owners.

165.    Specifically, Mayor Mayfield had vowed to "silence the MCR" and Chief Cody had offered to fund a competing newspaper in an effort to put the *Record* out of business.

166.    Mayor Mayfield's actions in overruling the City Administrator and authorizing Chief Cody to investigate the newspaper and its staff, and his actions in authorizing Chief Cody to raid the *Record*'s newsroom, were motivated by his desire to seek retribution against the *Record*.

167.    Similarly, Chief Cody's actions in making false statements in the applications for the search warrants for the *Record*'s newsroom, as well as his actions in executing the illegal search warrants, were motivated by his desire to seek retribution against the *Record*.

### Official Policies

168.    The Marion City Code gave Mayor Mayfield sole "superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

169.    Accordingly, Mayor Mayfield's actions constitute an official municipal policy of the City of Marion.

### Harm to Cheri Bentz

170.    As an employee of the *Record*, Bentz was caught in the crossfire of this retaliation and was harmed by it.

171.     Specifically, following the raid, Bentz has lost sleep, has seen her daily quality of life diminish, has seen her social relationships impacted, and has faced aggravated health conditions.

172.     Moreover, the raid would chill an ordinary person from exercising their freedom of speech.

173.     Indeed, the raid has had a chilling effect on Bentz exercising her First Amendment freedom of speech.

174.     Bentz has also reduced her workload with the *Record* because of the significant emotional toll of the raid, thus inhibiting the *Record*'s ability to exercise its First Amendment protected functions as a news organization.

175.     Moreover, Officer Hudlin, who played a large role in the raids, has been appointed Acting Chief of Marion Police, leaving lingering concerns for all *Record* staff, including Bentz.

**Remaining Elements of Cause of Action**

176.     Bentz has been damaged by Defendants' wrongful actions.

177.     Defendants acted maliciously and wantonly in violating Bentz's First Amendment rights.

**Count III**

**Fourth Amendment (42 U.S.C. § 1983)**

**(Former Chief Cody, Acting Chief Hudlin, Sheriff Soyez, and Detective Christner)**

178.     The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

searched, and the persons or things to be seized.

179.    The United States Supreme Court has established a four factor reasonableness test to determine whether a temporary seizure is constitutional under the Fourth Amendment: "(1) the police had probable cause to believe the property 'contained evidence of a crime or contraband,' (2) 'the police had good reason to fear' the contraband would be destroyed before the police returned to the location with a warrant, (3) 'the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy,' and (4) 'the police imposed the restraint for a [sufficiently] limited period of time.'" *United States v. Pérez-Díaz*, 848 F.3d 33, 40 (1st Cir. 2017) (quoting *Illinois v. McArthur*, 531 U.S. 326, 331-33, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001)).

180.    On August 11, 2023, during the *Record* raid, law enforcement did not have probable cause to believe that any device in the newsroom contained "evidence of a crime."

181.    More specifically, law enforcement had absolutely no reason to believe that Bentz's electronic devices, including her cellphone, contained "evidence of a crime."

182.    Bentz informed law enforcement that she only used her cellphone for personal reasons, and Bentz was not personally implicated in any alleged identity theft.

183.    Thus, law enforcement had absolutely no basis to believe that evidence would be deleted from Bentz's electronic devices.

184.    Yet even after admitting that Bentz had "little involvement" in any alleged crime that law enforcement was investigating during its newsroom raid, Chief Cody did not allow Bentz to retrieve her cellphone.

185.    Indeed, Bentz was unable to retrieve her phone for the entire duration of the raid, lasting for practically the entire work day, which is clearly not a "[sufficiently] limited period of

time" to seize a device that is knowingly unconnected from any alleged crime.

186.    Moreover, "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations omitted) (citations omitted).

187.    "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.* (citations omitted).

188.    "When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence," the test for determining whether a seizure occurred for purposes of the Fourth Amendment is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 255 (internal quotations omitted) (citations omitted).

189.    When law enforcement raided the *Record* newsroom on August 11, 2023, they made a clear "show of force," entering the newsroom armed and bearing a search warrant.

190.    When Chief Cody and his troop of officers encountered Bentz in the newsroom, Chief Cody told her they were conducting an investigation, instructed her to leave her electronic devices, and ordered her to leave the newsroom and join her coworkers outside, where other law enforcement officers were standing and watching *Record* staff.

191.    Chief Cody then informed the *Record* employees that he would be questioning them inside the newsroom one at a time.

192.    While law enforcement did not use any physical force against Bentz, a reasonable

person in her position would believe that they were "not free to leave." *See id.*

193.    Thus, Bentz was seized by law enforcement for purposes of the Fourth Amendment.

194.    As Marion County Attorney Joel Ensey's revocation of the search warrants after the raid highlighted, there was no probable cause underlying the search warrants.

195.    Thus, all actions taken pursuant to the search warrants constituted an unreasonable search and seizure, and a violation of the Fourth Amendment.

196.    More specifically, Bentz was not personally implicated in any alleged crime.

197.    Bentz's name did not appear on any of the search warrants.

198.    Law enforcement had no reason to suspect Bentz had committed a crime.

199.    Law enforcement had no reason to believe Bentz possessed any evidence of a crime.

200.    During Chief Cody's questioning of Bentz, Bentz informed law enforcement that she had no knowledge of any alleged crime.

201.    During Chief Cody's questioning of Bentz, Chief Cody admitted that he believed Bentz had "little involvement" in any alleged crime.

202.    Yet Bentz was not told she was free to leave immediately after her questioning.

203.    The continued search of the newsroom and presence of armed law enforcement officers would lead a reasonable person in Bentz's position to believe they were not free to leave.

204.    Seizing Bentz was thus an unreasonable and unconstitutional violation of her Fourth Amendment rights.

**Count IV**

**Privacy Protection Act (42 U.S.C. § 2000aa)**

**(City of Marion and Sheriff Soyez)**

205.     Plaintiff realleges and incorporates by reference paragraphs 1 through 204.

206.     The Privacy Protection Act of 1980 provides that "it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any documentary [or work product] materials possessed by a person in connection with a purpose to disseminate to the public a newspaper … or other similar form of public communication, in or affecting interstate or foreign commerce." 42 U.S.C. ¶ 2000aa.

207.     The Act defines "documentary materials" as "materials upon which information is recorded," including "written or printed materials," was well as "other mechanically, magnetically [sic] or electronically recorded cards, tapes, or discs." 42 U.S.C. ¶ 2000aa-7(a).

208.     The Act defines "work product materials" as materials prepared in connection with a purpose of communicating such materials to the public and which include mental impressions, conclusions, opinions, or theories of the author. 42 U.S.C. ¶ 2000aa-7(b).

209.     The search warrant for the *Marion County Record* newsroom sought both "documentary" and "work product materials."

210.     For example, the search warrant sought "Documents and records pertaining to Kari Newell," which would include reporter's notes about Newell, drafts of yet-to-be-published newspaper articles about Newell, internal communications about Newell, etc.

211.     Additionally, the search terms which were used to conduct the so-called "preview search" included "Kansas" and "Brogan Jones" (the Marion City Administrator) and "Ruth Herbel" (the Marion Vice-Mayor).

212.     These terms would include reporter's notes about the state, the city administrator, and the vice-mayor; drafts of yet-to-be-published newspaper articles about the state, the city administrator, and the vice-mayor; internal communications about the state, the city administrator, and the vice-mayor, etc.

213.     The *Marion County Record* is a newspaper "in or affecting interstate commerce" in that prior to the raids it regularly mailed copies of the newspaper to subscribers in, inter alia, Arizona, California, Colorado, Illinois, Iowa, Minnesota, Missouri, and Wisconsin.

214.     Additionally, the *Marion County Record* hosts a website, marionrecord.com, on which it posts the content of its newspaper.

215.     That website is an "other similar form of public communication" under the Act and is regularly accessed by readers outside the State of Kansas.

216.     At the time of the raids, probable cause did not exist to believe that anyone at the *Marion County Record*, including Bentz, had committed or were committing any criminal offense.

217.     Specifically, at the time of the raids, probable cause did not exist to believe that anyone at the *Marion County Record*, including Bentz, had violated or were violating K.S.A. 21-6107 or K.S.A. 21-5839.

218.     The very first sentence of the "Division of vehicles; records; disclosure" statute provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

219.     Thus, the information which the Record accessed, i.e., that Newell's driver's license was suspended due to a DUI conviction, was specifically authorized under Kansas law,

which states such information is subject to the Kansas Open Records Act.

220.    As such, no one at the *Record* committed identify theft, identity fraud, or unlawfully accessing a computer.

221.    At the time of the raids, there was no reason to believe that the immediate seizure of any materials was necessary to prevent the death of, or serious bodily injury to, a human being.

222.    Prior to the time of the raids, no subpoena duces tecum had been issued for any of the materials sought in the search warrant for the newsroom of the *Marion County Record*.

223.    At the time of the raids, there was no reason to believe that the giving of notice pursuant to a subpoena duces tecum would result in the destruction, alteration, or concealment of such materials.

224.    In fact, Eric Meyer notified both Chief Cody and Sheriff Soyez of the existence of the August 1, 2023, letter from the Kansas Department of Revenue.

225.    The Act provides that "[a] person aggrieved by a search for or seizure of materials in violation of this chapter shall have a civil cause of action for damages for such search or seizure … against any other governmental unit, … which shall be liable for violations of this chapter by their officers or employees while acting within the scope or under color of their office or employment." 42 U.S.C. ¶ 2000aa-6(a)(1).

226.    Cheri Bentz is a "person aggrieved by a search for or seizure of materials in violation of" the Act.

227.    The actions that law enforcement took in violation of the Privacy Protection Act resulted in Bentz being unlawfully detained, having her cellphone illegally seized, and being interrogated by police.

228.    Moreover, Bentz is now suffering from mental and emotional anguish, a loss of

sleep, deteriorated social relationships, and aggravated health conditions.

229.    The Act defines "any other governmental unit" as "any local government, unit of local government, or any unit of State government." 42 U.S.C. ¶ 2000aa-7(c).

230.    The City of Marion, Kansas, and the Marion County Sheriff are therefore "other governmental units" under the Act.

231.    Chief Cody, Officer Hudlin, and Det. Christner were "acting within the scope or under color of their office or employment" when they raided the newsroom of the *Marion County Record*.

232.    Sheriff Soyez was "acting within the scope or under color of [his] office or employment" when he directed the raid on the newsroom of the *Marion County Record*.

233.    Defendants acted maliciously and wantonly in violating Bentz's rights.

234.    The Act provides that in addition to actual damages, a person having a cause of action under the Act is entitled to recover their attorney's fees. 42 U.S.C. § 2000aa-6(f).

WHEREFORE, Plaintiff Cheri Bentz prays that the Court enter judgment in her favor as to the foregoing Counts I-IV, award her compensatory damages including for emotional distress, pain and suffering, and other non-economic damages, award her reasonable attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988(b), award punitive damages for Defendants' willful and/or wanton conduct, and grant such other and further relief as the Court deems just and equitable in the circumstances.

## Jury Demand

Plaintiff Cheri Bentz demands a trial by jury on all issues triable to a jury.

**Designation of Place of Trial**

Pursuant to Local Rule 40.2, Plaintiff will file a Designation of Place of Trial

contemporaneous to the filing of this Complaint, designating Kansas City, Kansas as the Place

of Trial.

Respectfully submitted,

STEVENS & BRAND LLP

By: **_s/ J. Eric Weslander_**
J. ERIC WESLANDER, #24549
900 Massachusetts, Suite 500
P.O. Box 189
Lawrence, Kansas 66044
Telephone ~ (785) 843-0811
Facsimile ~ (785) 843-0341
eweslander@stevensbrand.com
*Attorneys for Plaintiff*