## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CHERI BENTZ,**

                                        **Plaintiff**,                    **Case No. 24-2120-DDC-GEB**

**v.**

**CITY OF MARION, KANSAS, et al.,**

                                        **Defendant**.

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Cheri Bentz was an officer manager at the *Marion County Record*, a small-town newspaper. She alleges that local law enforcement officials unlawfully procured and executed a search warrant on the *Record*'s offices and in the process violated her constitutional and statutory rights. She sues a series of defendants: the City of Marion, Kansas; Marion's former mayor, David Mayfield; Marion's former Chief of Police, Gideon Cody; Marion's acting Chief of Police, Zach Hudlin; the Board of County Commissioners of Marion County, Kansas; Marion County's Sheriff Jeff Soyez; and a Marion County detective, Aaron Christner.[1]

The Board of County Commissioners, Sheriff Soyez, and Detective Christner (collectively, "county defendants") filed a Motion to Dismiss (Doc. 38). Former Chief Cody, acting Chief Hudlin, former Mayor Mayfield, and the City of Marion (collectively, "city defendants") filed their own Motion to Dismiss (Doc. 40), too. Plaintiff filed a Response to both motions. Doc. 52; Doc. 53. And defendants submitted Replies. Doc. 54; Doc. 55.

---

[1]     Plaintiff sues Mayfield, Cody, and Soyez in their individual and official capacities. Plaintiff's claims against Christner and Hudlin are individual capacity claims only.

After briefing on these motions was complete, plaintiff filed a Motion for Leave to File a Supplemental Response (Doc. 57). This Order grants in part and denies in part defendants' Motions to Dismiss (Doc. 38; Doc. 40). And it denies plaintiff's Motion for Leave to File a Supplemental Response (Doc. 57). The court explains its rulings, below, starting with a summary of the facts plaintiff alleges.

## I.    Background

The following facts come from plaintiff's Amended Complaint (Doc. 29). The court accepts plaintiff's "well-pleaded facts as true, view[s] them in the light most favorable to Plaintiff[], and draw[s] all reasonable inferences from the facts in favor of Plaintiff[]." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted).

### *Setting the Scene*

Plaintiff worked as the office manager for the *Marion County Record*, a small-town newspaper located in Marion, Kansas. Doc. 29 at 2 (Am. Compl. ¶ 1). Plaintiff's role mainly consisted of administrative tasks, but she also worked as a journalist for the *Record*. *Id.* (Am. Compl. ¶¶ 2–3, 5–6).

Local law enforcement officials and community leaders allegedly harbored animus toward the *Record*. *Id.* at 3–4 (Am. Compl. ¶¶ 12, 14, 15). In particular, defendant Gideon Cody—who served as the Marion Police Chief during the period relevant to this action—was unhappy that the *Record* had investigated his past. *Id.* (Am. Compl. ¶¶ 13–14). Likewise, defendant David Mayfield—who served as Marion's mayor—allegedly disliked the *Record* because the *Record* had published editorials that criticized him. *Id.* at 4 (Am. Compl. ¶¶ 16–19).

### *Lead Up to Raids*

United States Representative Jake LaTurner hosted a town-hall-style event in August 2023 at Kari's Kitchen, a Marion coffeeshop owned by local resident Kari Newell. *Id.* (Am.

Compl. ¶¶ 20–21).  Some of the *Record*'s staff attended that event.  *Id.* at 4–5 (Am. Compl.

¶ 22).  Then, Newell asked Cody to remove the *Record*'s staff from the event.  *Id.*  Cody did.  *Id.*

The day after the event with the congressman, *Record* reporter Phyllis Zorn received an

anonymous tip stating that Newell didn't have a valid driver's license due to a prior DUI

conviction.  *Id.* at 5 (Am. Compl. ¶ 23).  The tipster also alleged that local law enforcement

officials knew this information.  *Id.* (Am. Compl. ¶ 24).  In addition to the message, the tipster

attached a copy of a letter from the Kansas Department of Revenue (KDOR), which outlined the

steps Newell would need to take to reinstate her driver's license.  *Id.* (Am. Compl. ¶ 25).  This

letter included Newell's full name, address, date of birth, and driver's license number.  *Id.* (Am.

Compl. ¶ 26).  Eric Meyer—publisher of the *Record*, *id.* at 4 (Am. Compl. ¶ 19)—and Phyllis

Zorn used the Kansas Driver's License Status Check function on a publicly available website to

verify the accuracy of the letter.  *Id.* at 5 (Am. Compl. ¶ 27).  The *Record* decided not to publish

an article about Newell's suspended license, but Meyer emailed Chief Cody and defendant Jeff

Soyez—Marion County's sheriff—to alert them to this letter.  *Id.* at 6 (Am. Compl. ¶¶ 30–31).

Meyer also offered to cooperate with law enforcement if Cody or Soyez had a reason to believe

that crime was afoot.  *Id.* (Am. Compl. ¶ 32).  Neither Cody nor Soyez responded to Meyer's

email.  *Id.* (Am. Compl. ¶ 36).

Soyez was a personal friend of Cody's and had advocated for Cody's hiring.  *Id.* at 6

(Am. Compl. ¶ 33).  Plaintiff alleges that Soyez also "had personal animus toward the *Record*"

and had "regularly" expressed his disapproval of the *Record* and its negative coverage of

Marion.  *Id.* (Am. Compl. ¶ 34).  Plus, Soyez was concerned that the *Record* would "expose" the

Marion County Sheriff's Office and "the Marion Police Department for allowing Newell to drive

for years without a valid license."  *Id.* (Am. Compl. ¶ 35).

Marion's vice mayor also received the KDOR letter from the same tipster who had contacted the *Record*. *Id.* (Am. Compl. ¶¶ 37–38). The vice mayor forwarded the information to Marion's city administrator, who expressed his opinion that the City wouldn't look into the matter. *Id.* at 6, 7 (Am. Compl. ¶¶ 37, 39). The city administrator forwarded the email from the vice mayor to Mayor Mayfield and the other members of the Marion City Council. *Id.* at 7 (Am. Compl. ¶ 40). Mayfield and another city councilmember contacted Newell. *Id.* (Am. Compl. ¶ 41). They falsely told her that the vice mayor planned to use Newell's prior DUI conviction as a reason to deny Newell's restaurant a liquor license. *Id.* Mayfield also told Newell that the only way to remove the vice mayor from power was if the vice mayor was convicted of a crime. *Id.* (Am. Compl. ¶ 42).

The City of Marion—with help from the Marion County Sheriff's Office—opened a criminal investigation into the *Record* at the direction of Mayor Mayfield. *Id.* at 6, 7 (Am. Compl. ¶¶ 36, 43–44). The City opened the investigation "under the false pretext" that someone had committed a crime to access publicly available information about Newell's driving record. *Id.* at 6 (Am. Compl. ¶ 36). Cody contacted Newell and falsely informed her that someone from the *Record* had stolen her identity, used it to access her driving records, and shared those records with the vice mayor. *Id.* at 7 (Am. Compl. ¶ 46). But Cody knew that a tipster—not someone from the *Record*—had shared the letter with the vice mayor. *Id.* (Am. Compl. ¶ 47). After hearing this information from Cody, Newell attended a city council meeting and repeated to the council what she'd heard from Cody. *Id.* at 8 (Am. Compl. ¶ 49). Meyer, who was also present at the meeting, told the council that no one from the *Record* had contacted the vice mayor about Newell's driver's license status. *Id.* (Am. Compl. ¶ 50).

After the city council meeting, Sheriff Soyez and Chief Cody met with defendant Aaron Christner, a detective for the Marion County Sheriff's Office. *Id.* (Am. Compl. ¶ 51). At Soyez's direction, Christner joined the investigation into the vice mayor and the *Record*. *Id.* Over the next few days, Christner and Cody worked on drafting search warrants for the *Record*, the vice mayor's home, the tipster's home, and Meyer's home. *Id.* (Am. Compl. ¶ 52). Christner wrote the warrant applications but didn't sign them. *Id.* (Am. Compl. ¶ 53). The Marion County Attorney delivered the warrant applications to a magistrate judge for approval. *Id.* (Am. Compl. ¶ 54).

Plaintiff alleges numerous deficiencies in the warrant procurement process. *First*, plaintiff posits that the warrant process violated the Fourth Amendment's oath-or-affirmation requirement because Cody didn't appear in person before the magistrate even though the magistrate signed that Cody had "subscribed and signed" the application before her. *Id.* at 9, 15–16 (Am. Compl. ¶¶ 58–61, 107–12).

*Second*, the warrant for the *Record*'s office wasn't supported by probable cause. *Id.* at 13 (Am. Compl. ¶ 94). Specifically, the warrants issued were "based on materially false statements[.]" *Id.* (Am. Compl ¶ 95). These falsehoods include:

- Someone at the *Record* must have "lied about the reasons why [Newell's] record was being sought." *Id.* (Am. Compl. ¶ 95(b)) (quotation cleaned up).

- To use the Kansas Driver's License Status Check tool, a user must provide a reason for accessing the information. *Id.* at 13–14 (Am. Compl. ¶ 95(c)).

- To use the Driver's License Status Check tool, a user must "show a legal reason to obtain the information according to the Driver's Privacy Protection Act of 1994[.]" *Id.* at 14 (Am. Compl. ¶ 95(d)).

- The Kansas Driver's License Status Check tool includes a warning, which states: "By proceeding past this screen, I declare that I am eligible and have the express authority to receive the requested information pursuant to the Federal Driver's Privacy Protection Act of 1994, as amended. I further declare that any personal information I receive[] will not be used to sell or offer for sale any property or service." *Id.* (Am. Compl. ¶ 95(f)).

In reality, plaintiff alleges, the Kansas Driver's License Status Check tool is publicly available, doesn't require a username or password, and doesn't offer any warning about accessing information on the website. *Id.* (Am. Compl. ¶¶ 96–97).

### *Raids*

Chief Cody led a team that included defendants Christner and Hudlin—then a Marion police officer—to execute the search warrant. *Id.* at 9 (Am. Compl. ¶¶ 62, 64). When the officers arrived on scene, two *Record* reporters were outside. *Id.* (Am. Compl. ¶ 65). Cody "snatched" one of the reporter's phones out of her hand. *Id.* (Am. Compl. ¶ 66). Cody then led the officers into the *Record*'s office, where they encountered plaintiff. *Id.* at 9–10 (Am. Compl. ¶¶ 67–68). Cody told plaintiff that they were conducting a search warrant and ordered plaintiff to go outside. *Id.* at 10 (Am. Compl. ¶¶ 69, 71). As plaintiff was leaving the building, Cody asked her if she had left "all of her electronic devices" inside. *Id.* (Am. Compl. ¶ 71) (brackets omitted). Plaintiff "responded affirmatively." *Id.* Once outside, Cody told the *Record* staff that the search warrant allowed the officers to recover "everything." *Id.* (Am. Compl. ¶ 72). He also told them that he would question each of them individually. *Id.*

Cody interrogated two *Record* reporters before calling plaintiff inside for questioning. *Id.* (Am. Compl. ¶ 73). Officer Hudlin read plaintiff her *Miranda* rights. *Id.* (Am. Compl. ¶ 74). Cody told plaintiff that they were looking for devices that had downloaded Newell's driving records. *Id.* (Am. Compl. ¶ 75). Plaintiff explained that she was not directly involved in reporting and mainly used her computer for accounting "and some minor rewrites." *Id.* (Am. Compl. ¶ 76). Plaintiff also told Cody that she didn't know which computers downloaded Newell's information. *Id.* at 11 (Am. Compl. ¶¶ 77–78). Eventually, Hudlin took plaintiff back outside. *Id.* (Am. Compl. ¶ 80). Plaintiff stayed outside "for several more hours" until officers completed the search and allowed the staff to reenter the building. *Id.* (Am. Compl. ¶ 81).

6

Although officers were unable to identify evidence of a crime with preview searches, Sheriff Soyez told Chief Cody, "just take them all," causing the officers to seize much of the electronic equipment in the *Record*'s newsroom.  *Id.* (Am. Compl. ¶ 82).  According to the Amended Complaint, these seizures "incapacitated the *Record*."  *Id.* at 19 (Am. Compl. ¶ 142).  After the raid, Sheriff Soyez met with Cody to eat pizza and recap the raid.  *Id.* at 21 (Am. Compl. ¶ 159).

Some time after the raid, the Marion County Attorney filed a motion to release the seized evidence.  *Id.* at 19 (Am. Compl. ¶ 138).  He also issued a press release, which expressed his opinion that "'insufficient evidence' exists 'to establish a legally sufficient nexus' between any crime local law enforcement had been investigating and 'the places searched and the items seized.'"  *Id.* (Am. Compl. ¶ 139).

In total, plaintiff alleges that defendants detained, interrogated, and separated her from her property because plaintiff did "her job in furtherance of the *Record*'s protected First Amendment activity."  *Id.* at 11 (Am. Compl. ¶ 83).  She also asserts that she "has lost sleep, has seen her daily quality of life diminish, has seen her social relationships affected, and has faced aggravated health conditions" as a result of the raid.  *Id.* (Am. Compl. ¶ 84).

### *Lawsuit*

The Amended Complaint organizes plaintiff's suit into five counts.  They are:

- *Count I*:  First Amendment direct violation under 42 U.S.C. § 1983 against Chief Cody, Acting Chief Hudlin, Sheriff Soyez, the Board of County Commissioners of Marion County, and Detective Christner, *id.* at 12 (Am. Compl.);

- *Count II*:  First Amendment retaliation under § 1983 against the City of Marion, Mayor Mayfield, the Board of County Commissioners of Marion County, and Chief Cody, *id.* at 22 (Am. Compl.);

- *Count III*:  Fourth Amendment violation under § 1983 against Chief Cody, Acting Chief Hudlin, Sheriff Soyez, the Board of County Commissioners of Marion County, and Detective Christner, *id.* at 25 (Am. Compl.);

- *Count IV*:  Privacy Protection Act violation against the City of Marion, the Board of County Commissioners of Marion County, and Sheriff Soyez, *id.* at 29 (Am. Compl.); and

- *Count V*:  Conspiracy to violate civil rights against the individual defendants, *id.* at 32 (Am. Compl.).

Now, the court turns to defendants' motions, starting by reciting the governing legal standard.[2]

## II.        Legal Standard

Defendants' motions invoke Rule 12(b)(1) and 12(b)(6).  So, the court explains the

standard governing motions made under each of these rules, starting with Rule 12(b)(1).

### A.  12(b)(1)

Under Rule 12(b)(1), a defendant may move the court to dismiss for lack of subject

matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction

and, as such, must have a statutory basis to exercise jurisdiction."  *Montoya v. Chao*, 296 F.3d

952, 955 (10th Cir. 2002).  "A court lacking jurisdiction cannot render judgment but must

dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is

lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  The party

invoking federal jurisdiction bears the burden to prove it exists.  *Kokkonen v. Guardian Life Ins.

Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*,

---

[2]        Defendants attached several documents to their motions.  The court clarifies here which ones it properly may consider.

*First,* it properly may consider the search warrant and warrant application attached to defendants' motions because they're "'central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"  *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).  Ultimately, however, the court finds it unnecessary to consult the warrant or warrant application to resolve defendants' arguments.

*Second,* the city defendants filed an array of other exhibits, including a statement from Hudlin and a handwritten note from Newell.  *E.g.*, Doc. 41-4; Doc. 41-5.  But these other exhibits don't satisfy any exception to the general rule that "a court should consider no evidence beyond the pleadings" when deciding a motion to dismiss.  *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018) (internal quotation marks and citation omitted).

906 F.3d 926, 931 (10th Cir. 2018) (presuming "no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction"). Where, as here, defendants base their motion on a "facial attack on the complaint, a district court must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001).

The court explains the standard governing motions made under Rule 12(b)(6), next.

### B.  12(b)(6)

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)). The Tenth Circuit has explained that "[t]here is a 'low bar for surviving a motion to dismiss[.]'" *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)). "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and

that a recovery is very remote and unlikely[.]'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quoting *Quintana*, 973 F.3d at 1034).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

This Order's analysis unfolds as follows:  *First*, the court provides a brief overview of the law governing § 1983 claims and qualified immunity.  *Second*, the court analyzes defendants' arguments about plaintiff's claims against the individual defendants.  The court starts with plaintiff's First Amendment claims and then moves on to her Fourth Amendment claims and conspiracy allegations.  *Third*, the court evaluates plaintiff's claims against the municipal defendants, starting with her § 1983 claims and ending with her Privacy Protection Act claim. *Finally*, the court addresses plaintiff's motion for leave to file additional papers.

### A.  Section 1983 and Qualified Immunity Overview

The law on 42 U.S.C. § 1983—under which the claims in four of plaintiff's counts arise—and a qualified immunity defense are relevant throughout this Order.  So, the court starts with a brief overview of these topics.

#### 1.  Section 1983

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, "which requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler*

*v. Stitt*, 104 F.4th 770, 797 (10th Cir. 2024) (internal quotation marks and citation omitted). A plaintiff may assert a § 1983 claim against either a municipality or an individual. *See Brown*, 124 F.4th at 1264 (permitting § 1983 suit for policies and practices of municipal police department), *id.* at 1266 (permitting § 1983 suit against police chief in his individual capacity). As a defense against a § 1983 claim, an individual defendant may assert qualified immunity. *Id.* at 1266. But "[q]ualified immunity is not available as a defense to municipal liability." *Pyle v. Woods*, 874 F.3d 1257, 1264 (10th Cir. 2017) (citing *Owen v. City of Independence*, 445 U.S. 622, 637–38 (1980)). The court outlines the broad contours of the qualified immunity defense, next.

## 2.  Qualified Immunity

"When a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the [1] defendant[] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time.'" *Brown*, 124 F.4th at 1265 (alterations in original) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)). That's so because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed." *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional violation and that that violation was clearly established."). If plaintiff fails to carry this burden,

"'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed." *Losee v. Preece*, No. 18-CV-195-TC, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted). A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79 (2017), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

"Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quotation cleaned up). But such authority is unnecessary and "a government official may still have notice that their conduct violates a constitutional right" when "it is so apparent as to apply with obvious clarity." *Brown*, 124 F.4th at 1265. "In this regard, the Supreme Court has reminded us recently that under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The degree of specificity required from prior case law depends in part on the character of the challenged

conduct.  The more obviously egregious the conduct in light of prevailing constitutional

principles, the less specificity is required from prior case law to clearly establish the violation.").

### B. First Amendment Claims

The Amended Complaint asserts two distinct First Amendment claims:  a "direct" claim

and a retaliation claim.  Doc. 29 at 12 (Am. Compl.) (Count I); *id.* at 22 (Am. Compl.) (Count

II).  Plaintiff's briefing clarifies that the "direct" claim is one asserting a "prior restraint."  Doc.

52 at 5; *see also* Doc. 53 at 8.

#### 1. Standing

Both the county defendants and the city defendants contend that plaintiff lacks standing

to bring a First Amendment claim.  Doc. 39 at 7–8; Doc. 41 at 10–11.

Article III of the Constitution limits the court's jurisdiction to adjudicating "Cases" and

"Controversies."  *Murthy v. Missouri*, 603 U.S. 43, 56 (2024).  "'To establish Article III

standing, the plaintiff must show injury in fact, a causal relationship between the injury and the

defendants' challenged acts, and a likelihood that a favorable decision will redress the injury.'"

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1181 (10th Cir. 2010) (quoting

*People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir.

2002)).  Defendants' arguments here challenge the injury-in-fact element of this test.  *See* Doc.

39 at 7–8; Doc. 41 at 10–11.  An injury in fact "requires 'an invasion of a legally protected

interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or

hypothetical.'"  *Brammer-Hoelter*, 602 F.3d at 1181 (quoting *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992)).  The Supreme Court has explained that these "requirements help ensure

that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant her

invocation of federal-court jurisdiction.'"  *Murthy*, 603 U.S. at 57 (brackets omitted) (quoting

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

Defendants' argument goes like this:  The *Record*—not plaintiff—was injured by defendants' conduct.  *See* Doc. 39 at 7; Doc. 41 at 11.  So, they contend, plaintiff didn't suffer any injury, and plaintiff's allegations that she experienced a "subjective chilling" aren't sufficient to confer standing.  *Id.*  The court agrees, in part.

As an initial matter, plaintiff has standing to assert a retaliation claim.  She alleges that defendants detained her and separated her from her belongings in violation of her Fourth Amendment rights, Doc. 29 at 11, 28 (Am. Compl. ¶¶ 83, 216); that she suffered emotional and psychic injuries because of defendants' raid, *id.* at 24–25 (Am. Compl. ¶¶ 183, 186); and that she has experienced a subjective chilling of her First Amendment rights, *id.* at 25 (Am. Compl. ¶ 188).  Plaintiff's allegation that she suffered a Fourth Amendment violation in retaliation for exercising her First Amendment rights alone suffices to confer standing.  *See Day v. Bond*, 500 F.3d 1127, 1137 (10th Cir. 2007) ("[I]t is axiomatic that a plaintiff has standing to assert that his or her First Amendment rights have been violated.").  That's so because it demonstrates that plaintiff experienced an "invasion of a 'legally protected interest[.]'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc).[3]

The thornier issue is whether plaintiff has standing to bring her prior restraint claim.  The injury for a prior restraint claim is, by definition, chilled or obstructed future speech.  *See Brammer-Hoelter*, 602 F.3d at 1182 ("A prior restraint claim is distinct from a retaliation claim because it is based on a restriction that chills potential speech before it happens rather than an adverse action taken in response to actual speech." (internal quotation marks and citation omitted)).  Ordinarily, litigants raise prior restraint claims when laws, orders, or rules threaten

---

[3]     The city defendants argue that plaintiff lacks standing to bring her retaliation claim because she hasn't alleged "retaliatory animus toward her personally or her position as office manager."  Doc. 41 at 13.  This argument puts "the merits cart before the standing horse."  *Walker*, 450 F.3d at 1093.  The court "must assume the Plaintiff['s] claim has legal validity" when assessing standing.  *Id.*

sanctions for future speech. *See, e.g, id.* at 1180 (alleging prior restraint claim based on supervisor's directive to not "meet[] together to discuss school matters" and based on employer's "code of conduct"); *Walker*, 450 F.3d at 1088 ("Most cases involving standing based on a First Amendment chilling effect arise in the context of criminal laws prohibiting various forms of speech or expressive conduct."). But here, plaintiff doesn't base her prior restraint claim on the threat of future prosecution.

Plaintiff evidently asserts that the raid on the *Record*'s office chilled her future speech. *See* Doc. 29 at 21 (Am. Compl. ¶ 154) (arguing that plaintiff has "lingering concerns . . . about the potential for another illegal raid"); Doc. 52 at 5. Our Circuit has explained that "a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arises from an objectively justified fear of real consequences.'" *Walker*, 450 F.3d at 1088 (brackets omitted) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)); *see also Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) ("[T]o satisfy Article III, the plaintiff's expressive activities must be inhibited by 'an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement.'" (quoting *D.L.S.*, 374 F.3d at 975)).

Plaintiff here hasn't met that standard. To be sure, plaintiff alleges that the raid had a "chilling effect" on her "exercising her First Amendment freedom of speech[.]" Doc. 29 at 20 (Am. Compl. ¶ 151). But the Amended Complaint is devoid of allegations evincing a "credible threat of prosecution or other consequences" from her continued exercise of her First Amendment rights. *Winsness*, 433 F.3d at 732. In other words, even assuming the allegations in the Amended Complaint as true, the court can't conclude reasonably that plaintiff faces a

"credible threat" of future sanctions for her speech. She simply provides no allegations from which to derive a "credible threat." So, her injury is merely "'conjectural or hypothetical[,]'" which won't do. *Brammer-Hoelter*, 602 F.3d at 1181 (quoting *Lujan*, 504 U.S. at 560). Plaintiff thus lacks standing to bring her prior restraint claim. And the court thus lacks jurisdiction to adjudicate it. Lacking jurisdiction over this claim, the court dismisses plaintiff's prior restraint claim.[4]

The court next analyzes defendants' arguments attacking the viability of plaintiff's First Amendment retaliation claim.

### 2. Retaliation

Defendants next take aim at plaintiff's second claim, one alleging First Amendment retaliation. Recall that plaintiff asserts this claim against the City of Marion, former Mayor Mayfield, Sheriff Soyez, the Board of County Commissioners, and former Police Chief Cody. Doc. 29 at 22 (Am. Compl.) (Count II). The court starts its analysis with Soyez and Mayfield and concludes these actors aren't liable for plaintiff's injuries as a matter of law. The court then analyzes Cody's various arguments against plaintiff's claim, deciding plaintiff has pleaded a plausible retaliation claim against Cody.[5]

### a. Soyez

The county defendants argue that (1) plaintiff hasn't alleged adequately the third element of a retaliation claim and (2) plaintiff's allegations fail to causally connect Sheriff Soyez to her First Amendment injuries. Doc. 39 at 8–9. The court concludes that plaintiff has failed to allege

---

[4]    Because the court dismisses plaintiff's prior restraint claim for want of jurisdiction, it needn't reach defendants' alternative arguments attacking the viability of plaintiff's prior restraint claim. *See* Doc. 41 at 11–13; Doc. 39 at 8.

[5]    The court addresses plaintiff's claims against the municipal entities in a standalone section, below. *See* § III.E.

the requisite causal relationship between Soyez and her injuries.  The court thus dismisses plaintiff's retaliation claim against Soyez and needn't evaluate Soyez's alternative argument.

As already discussed, § 1983 imposes liability on actors acting under state law who "subject[], or cause[] to be subjected" any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983.  "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation but personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him."  *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (quotation cleaned up).  More specifically, "'[t]he requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"  *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010) (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)).  "Defendants are liable for the harm proximately caused by their conduct."  *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (citation omitted).  In other words, a defendant is liable under § 1983 for a constitutional injury if the injury "would not have occurred but for [his] conduct and if there were no unforeseeable intervening acts superseding [his] liability."  *Id.* (citation omitted).

The court now recites the Amended Complaint's allegations about Soyez.  Then, it explains why they don't satisfy our Circuit's causation standards for a § 1983 claim.  Here are the principal allegations about Soyez in the Amended Complaint:

- Soyez "had personal animus toward the *Record*" for multiple reasons.  Doc. 29 at 6 (Am. Compl. ¶¶ 34–35).

- Soyez met with Cody and Christner, and he reviewed the warrants with them.  *Id.* at 8 (Am. Compl. ¶¶ 51–52).

- "After officers were unable to identify any evidence of alleged identity theft using preview searches on the newsroom's electronics, Sheriff Jeff Soyez told Chief Cody to 'just take them all.'" *Id.* at 11 (Am. Compl. ¶ 82). This instruction prompted "law enforcement to empty the newsroom of its electronic equipment." *Id.*[6]

- Soyez "helped coordinate and direct the raids, including telling Chief Cody to take all of the *Record*'s electronic devices after the preview searches failed. Further, he ratified his employees' activities in coordinating and orchestrating the raid, including by meeting with Cody afterward to enjoy pizza and recap the raid[.]" *Id.* at 21–22 (Am. Compl. ¶ 159).

Even viewed in the light most favorable to plaintiff, these allegations can't establish a plausible § 1983 claim against Soyez for violating plaintiff's First and Fourth Amendment rights. Plaintiff hasn't explained how Soyez did anything to cause her constitutional injuries.

Start with the easy ones. Soyez's post-raid pizza party didn't cause plaintiff's injuries. It happened after the raid. *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[les] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." (emphasis in original)). Nor did Soyez's animus toward the *Record*—by itself—cause plaintiff's injuries.

Soyez's direction to Cody to seize the *Record*'s equipment likewise didn't cause plaintiff's injuries. The Amended Complaint alleges that plaintiff "was detained, interrogated, separated from her belongings, and treated like a criminal suspect for simply doing her job in furtherance of the *Record*'s protected First Amendment activity." *Id.* at 11 (Am. Compl. ¶ 83). Plaintiff doesn't explain how Soyez directing Cody to seize the *Record*'s equipment caused or contributed to her detention, interrogation, or separation from her property. And even if plaintiff could muster that explanation, there's no reason that Soyez "knew or reasonably should have

---

[6]    Soyez wasn't present for the raid, Doc. 29 at 9 (Am. Compl. ¶ 64), so the court assumes that Soyez gave this direction by telephone.

known" that his direction to Cody would cause Cody to violate plaintiff's constitutional rights. *Mink*, 613 F.3d at 1001 (quotation cleaned up).

The closest plaintiff comes to establishing the requisite causal connection to Soyez is her allegation that Soyez reviewed the warrants with Cody and Christner. Doc. 29 at 8 (Am. Compl. ¶¶ 51–52). Still, this allegation falls short as well. *First*, plaintiff hasn't alleged plausibly that Soyez's review is a but-for cause of the warrant issuing. In other words, plaintiff's provided no reason to doubt that Cody successfully would have procured the warrants without Soyez's review. *Second*, plaintiff hasn't alleged that Soyez "knew or reasonably should have known" that the warrants contained material falsehoods. *Mink*, 613 F.3d at 1001 (quotation cleaned up). After all, officers reasonably may rely on "'observations, statements, and conclusions of their fellow officers[.]'" *Eckert v. Dougherty*, 658 F. App'x 401, 407 (10th Cir. 2016) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998)). So even if Soyez thoroughly reviewed the warrant applications, there's simply no reason alleged that he knew or should have known that the warrants contained material falsehoods or otherwise failed to support probable cause.

Nor does plaintiff's response to Soyez's First Amendment causation argument move the needle. She merely asserts that she "does, in fact, allege that Soyez sought the warrants (albeit indirectly), participated in the investigation, and participated in the search." Doc. 53 at 10. Plaintiff's response to Soyez's Fourth Amendment causation arguments illuminates no more. She argues that she alleged Soyez's participation "in both the investigation and search of the newsroom[.]" *Id.* at 13 (emphasis omitted). She also argues that Soyez "provided direction to Cody over the phone during the raid and assigned his deputy, Christner, to be on the scene." *Id.* at 13. But she never explains how Soyez's alleged participation caused her injuries.

19

In short, plaintiff has failed to allege a plausible and sufficient causal connection between her injuries and any conduct by Soyez. This causation issue applies equally to plaintiff's First and Fourth Amendment claims against Soyez. So, the court dismisses them both.

### b. Mayfield

Like Soyez, Mayor Mayfield—as alleged—didn't cause plaintiff's injuries. And even if he did, Mayfield deserves qualified immunity.

Mayfield argues that he "had nothing to do with the search warrant or its execution." Doc. 41 at 18–19. Plaintiff doesn't respond to this argument directly. *See generally* Doc. 52. Here are the Amended Complaint's allegations about Mayfield:

- Mayfield disliked the *Record* and expressed his animus toward the *Record* publicly. Doc. 29 at 4 (Am. Compl. ¶¶ 15–17, 19).

- Mayfield falsely told Newell that Herbel planned to weaponize Newell's DUI conviction to oppose Newell's request for a liquor license. *Id.* at 7 (Am. Compl. ¶ 41).

- Mayfield overruled the city administrator's recommendation and authorized Cody to investigate Herbel and the *Record*. *Id.* (Am. Compl. ¶¶ 44–45). Mayfield's animus toward the *Record* motivated his decision to authorize this investigation. *Id.* at 23 (Am. Compl. ¶¶ 173–75).

Take them one at a time.

*First*, Mayfield's alleged animus—without more—didn't cause any injuries. Likewise, *second*, Mayfield's discussion with Newell isn't causally linked to plaintiff's constitutional injuries. Even without Newell's participation, the falsehoods in the search warrant application—such as the assertion that plaintiff either lied or impersonated Newell—would have produced probable cause for the warrants to issue. In any event, plaintiff hasn't shouldered her burden of showing that Mayfield violated clearly established law by relaying false information to Newell. That is, plaintiff hasn't directed the court to any Tenth Circuit or Supreme Court decision

showing that Mayfield violated clearly established law.  Mayfield is thus entitled to qualified immunity for his discussion with Newell.[7]

*Third*, the allegation that Mayfield authorized Cody to investigate Herbel and the *Record* doesn't suffice, either.  Even if Mayfield's direction to his subordinates to investigate was the but-for cause of plaintiff's injuries, plaintiff hasn't alleged any facts capable of supporting a finding or inference that Mayfield "'knew or reasonably should have known'" that his direction to investigate would deprive someone of their constitutional rights.  *Mink*, 613 F.3d at 1001 (quoting *Snell*, 920 F.2d at 700).

Regardless, Mayfield is entitled to qualified immunity for directing his subordinates to begin an investigation.  Plaintiff hasn't presented any argument that it was clearly established as unconstitutional to direct subordinates to investigate, even where the person directing the investigation has no basis to believe that a crime was committed.  *See Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) ("'The dispositive question is whether the violative nature of *particular* conduct is clearly established.'" (emphasis in original) (quoting *Mullenix v. Luna*, 577

---

[7]    The court reads Circuit precedent to place both a *pleading* and a *briefing* burden on plaintiffs seeking to survive a qualified immunity defense.  That is, a plaintiff must plead facts that plausibly allege a violation of federal law *and*, separately, show that the violation was clearly established.  *See, e.g.*, *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006) ("To overcome a qualified immunity defense, a plaintiff must first *establish* a violation of a constitutional or statutory right and then *show* that the right was clearly established." (emphasis added)); *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) ("If the plaintiff *establishes* a violation of a constitutional or statutory right, he must then *demonstrate* that the right at issue was clearly established at the time of the defendant's unlawful conduct." (emphasis added)); *Bledsoe*, 53 F.4th at 617 n.25 ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was Bledsoe's burden to show both that he had *alleged* a constitutional violation and that that violation was clearly established." (emphasis added)); *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (explaining that "the plaintiff bears the ultimate burden of persuasion to overcome qualified immunity" (quotation cleaned up)).  Still, the court is cognizant of the Supreme Court's instruction that whether "an asserted federal right was clearly established at a particular time . . . presents a question of law," so a court reviewing qualified immunity should "use its full knowledge of its own and other relevant precedents."  *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (quotation cleaned up).  To that end, the court finds no precedent suggesting that Mayfield's alleged conduct violated clearly established law.

U.S. 7, 11 (2015)); *cf. Frasier*, 992 F.3d at 1025 (explaining that proof defendants agreed to "engage in . . . lawful investigative activities" couldn't support a § 1983 claim). In fact, our Circuit has granted qualified immunity in a situation similar to the facts alleged here.

In *Lincoln v. Maketa*, the Tenth Circuit reasoned that a retaliatory criminal investigation into a plaintiff and his children didn't amount to a "violation of a clearly established constitutional right." 880 F.3d 533, 541 (10th Cir. 2018). Other circuits have held similarly. *E.g.*, *Moore v. Garnand*, 83 F.4th 743, 752–53 (9th Cir. 2023) (finding no violation of clearly established law where defendants "conducted a criminal investigation against Plaintiffs without any reasonable suspicion"); *Rehberg v. Paulk*, 611 F.3d 828, 851 (11th Cir. 2010) ("[The] right to be free from a retaliatory investigation is not clearly established. The Supreme Court has never defined retaliatory investigation, standing alone, as a constitutional tort[.]"). The court thus concludes, Mayor Mayfield is entitled to qualified immunity based on his alleged conduct directing an investigation.

In sum, the allegations against Mayfield fail to establish the requisite causal connection between his actions and plaintiff's injuries. Also, Mayfield is entitled to qualified immunity. And these conclusions apply equally to plaintiff's First and Fourth Amendment claims against Mayfield, so the court dismisses those claims.

### c. Cody

Unlike the claims against Soyez and Mayfield, plaintiff pleads a viable First Amendment retaliation claim against Cody. To establish a § 1983 First Amendment retaliation claim, a "plaintiff must show that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected

conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007).  Cody argues that

plaintiff has failed to allege all three elements of a First Amendment retaliation claim.  Doc. 41

at 14–15.  The court disagrees and below, taking each element in turn, explains why.

*First*, plaintiff has alleged that she engaged in constitutionally protected activity.

Specifically, the Amended Complaint asserts that plaintiff is "a journalist and member of the

*Record*'s editorial staff, who regularly creates articles and advertisements, and contributes

photographs to the *Record*."  Doc. 29 at 2 (Am. Compl. ¶ 3).  Plaintiff also alleges that she

"participates actively in the *Record*'s editorial planning meetings, suggests story ideas, and posts

to the *Record*'s website each week."  *Id.* (Am. Compl. ¶ 5).  True, plaintiff's "primary role" at

the *Record* was administrative in nature, *id.* (Am. Compl. ¶¶ 2–3), but she also engaged in

protected activity.  Plaintiff's argument that through her employment with the *Record*, she was

exercising First Amendment associational rights also persuades the court.  *See Brammer-Hoelter*,

602 F.3d at 1190–91 (recognizing retaliation-for-exercise-of-associational-rights claim).  In

short, plaintiff has alleged adequately that she was engaged in constitutionally protected activity.

*Second*, plaintiff has alleged injuries "that would chill a person of ordinary firmness from

continuing" to engage in protected activity.  *Van Deelen*, 497 F.3d at 1155.  Our Circuit employs

an objective test for this element.  *Irizarry v. Yehia*, 38 F.4th 1282, 1292 (10th Cir. 2022).  As

alleged, defendants raided plaintiff's place of work, detained her, and interrogated her.  Doc. 29

at 3, 9, 11 (Am. Compl. ¶¶ 10, 64, 83).  These actions would chill a person of ordinary firmness.

*See, e.g.*, *Perez v. County of Los Angeles*, No. CV 22-7696 SVW (AS), 2024 WL 3280697, at *8

(C.D. Cal. June 3, 2024) (holding that officer preventing plaintiff from news gathering by

"handcuffing her and locking her in a hot vehicle for almost two hours . . . . would chill a person

of ordinary firmness"); *Tabi v. Baker*, No. 20-CV-00323-VBF-JC, 2022 WL 3162203, at *5

(C.D. Cal. Feb. 2, 2022) (holding that 30-minute detention "while conducting a criminal investigation" would chill person of ordinary firmness (quotation cleaned up)); *Spiehs v. Larsen*, 728 F. Supp. 3d 1190, 1213 (D. Kan. 2024) (holding that law enforcement officers removing speaker from public meeting would chill person of ordinary because "the specter of law enforcement could chill speech . . . because speakers . . . fear arrest"). Plaintiff has satisfied the second element of a First Amendment retaliation claim.

*Third*, plaintiff has alleged plausibly that Cody's animus toward the *Record*, including plaintiff, motivated his retaliation. Cody concedes that the Amended Complaint alleges that he sought retribution against the *Record*. Doc. 41 at 15. But he argues that plaintiff hasn't alleged her personal involvement in publishing the editorials critical of Cody. *Id.* But plaintiff alleges that she "participate[d] actively in the *Record*'s editorial planning meetings[.]" Doc. 29 at 2 (Am. Compl. ¶ 5). Viewing these allegations in the light most favorable to plaintiff supports a reasonable inference that plaintiff participated in producing and publishing content that motivated Cody's animus. Also, Cody's argument doesn't respond to plaintiff's alternative theory: his retaliation against the *Record* (including its employees) violated plaintiff's associational rights under the First Amendment. Given the "low bar" required to survive a motion to dismiss, *Clinton*, 63 F.4th at 1276 (quotation cleaned up), the court concludes that plaintiff's pleading advances a plausible First Amendment retaliation claim against Cody.

Cody next argues he's entitled to qualified immunity. Doc. 41 at 15–16. As an initial matter, Cody's briefing on qualified immunity is perfunctory. *See id.* The court could reject it on that basis alone. *See Tillmon v. Douglas County*, 817 F. App'x 586, 589–90 (10th Cir. 2020) (explaining that single-paragraph, "cursory" presentation of qualified immunity defense wasn't adequate to preserve it for appellate review); *Fullen v. City of Salina*, No. 21-4010-JAR-TJJ,

2021 WL 4476780, at *12 (D. Kan. Sept. 30, 2021) (declining to consider qualified immunity where defendants didn't "address whether the Fourth Amendment rights at issue were clearly established").  But Cody's argument fails substantively as well.

To reiterate, qualified immunity requires a plaintiff to allege facts that show "'that [1] defendant plausibly violated their constitutional rights, and [2] that those rights were clearly established at the time.'"  *Brown*, 124 F.4th at 1265 (alterations in original) (quoting *Robbins*, 519 F.3d at 1249).  The court already has concluded that plaintiff has alleged a plausible First Amendment violation against Cody.  That conclusion takes care of the first prong of the qualified immunity analysis.

As for the second prong, "'any reasonable official in [Cody's] shoes would have understood'" that he was violating the law by doing what plaintiff alleges—lying to procure a search warrant in retaliation for a media institution publishing negative commentary.  *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015)).  To that end, it "has long been clearly established that the First Amendment bars retaliation for protected speech and association."  *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).  Cody thus doesn't deserve qualified immunity, and the court won't dismiss plaintiff's First Amendment retaliation claim against him.

### 3.  First Amendment Conclusion

The court briefly summarizes its holdings so far before moving on to plaintiff's Fourth Amendment claims.  The court dismisses the following:

- plaintiff's First Amendment prior restraint claim (because plaintiff lacks standing);

- all claims against Soyez;

- all claims against Mayfield.

25

Plaintiff's other First Amendment claims survive. Now, the Fourth Amendment claims.

### C. Fourth Amendment Claims

Count III of the Amended Complaint asserts a § 1983 Fourth Amendment violation against former Chief of Police Cody, Acting Chief Hudlin, Sheriff Soyez, the Board of County Commissioners of Marion County, and Detective Christner of the Sheriff's Office. Doc. 29 at 25 (Am. Compl.) (Count III). As discussed above, plaintiff hasn't alleged a plausible Fourth Amendment claim against Soyez. And the court addresses all municipal-liability issues in a separate section, below. *See* § III.E. So, for now, that leaves Cody, Hudlin, and Christner as the defendants at issue in this § III.C.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and instructs that "no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. Plaintiff appears to assert two Fourth Amendment injuries based on (1) her detention while defendants conducted the search-warrant raid, *id.* at 28 (Am. Compl. ¶ 216), and (2) defendants effectively seizing plaintiff's cell phone by separating her from it during that raid, *id.* at 26 (Am. Compl. ¶¶ 193–97).

#### 1. Standing

The county defendants argue that plaintiff lacks standing to bring her Fourth Amendment claim because she "did not own . . . the materials ultimately seized" and "[n]othing that was seized was under her immediate control." Doc. 39 at 10. The city defendants likewise contend that plaintiff lacks standing to challenge the warrant because "she didn't have a reasonable expectation of privacy in the [*Record*'s] office or its electronic devices." Doc. 41 at 17. The court readily rejects these arguments.

"Fourth Amendment rights are personal and cannot be asserted vicariously." *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 754 n.6 (10th Cir. 2024). "Although this principle is often called 'standing,' the idea that personal Fourth Amendment rights must be at stake 'is more properly subsumed under substantive Fourth Amendment doctrine.'" *United States v. Davis*, 750 F.3d 1186, 1190 (10th Cir. 2014) (quoting *Rakas v. Illinois*, 439 U.S. 128, 139 (1978)). The inquiry, then, in the words of our Circuit, is whether plaintiff had either "a possessory interest or reasonable expectation of privacy" that the search or seizure violated. *Id.* at 1190; *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016) (explaining that search violates Fourth Amendment when it "infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space" (emphasis in original)).

Plaintiff held a constitutionally protected interest in both her person and her cell phone. Start with her person. In the standing context, our Circuit has explained, "the 'Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of arrest.'" *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). That is, plaintiff didn't need to hold a reasonable expectation of privacy in the *Record*'s office to have standing to challenge the seizure of her person. *Cf. United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995) ("[W]e conclude that a passenger has standing to challenge a constitutionally improper traffic stop, detention, or arrest on Fourth Amendment grounds even though, when the seizure occurs, she has no possessory or ownership interest in either the vehicle in which she is riding or in its contents."). Defendants cite no authority—nor could the court locate any—supporting the contention that plaintiff lacks standing to challenge her detention.

The same goes for plaintiff's cell phone. She held a possessory interest and reasonable expectation of privacy in it. *See Riley v. California*, 573 U.S. 373, 393–98 (2014) (describing privacy interests that people have in their cell phones). Defendants' arguments miss the mark. They fail to identify a colorable reason why plaintiff lacks standing to challenge seizure of her cell phone.

To the extent that defendants' argument contends that plaintiff can't assert a constitutional violation flowing from the allegedly unlawful warrant, *see* Doc. 39 at 12; Doc. 54 at 3, the court again disagrees. Although the facts alleged here are rare if not unique, none of the cases that defendants cite support the proposition that a plaintiff must have a privacy interest in the target of a warrant to support a § 1983 claim based on injury caused by the unlawful warrant. The Tenth Circuit's jurisprudence in cases involving car stops supports the court's conclusion. Even where a person lacks a possessory interest or reasonable expectation of privacy in a vehicle, that person still may challenge "the constitutionally improper traffic stop . . . on Fourth Amendment grounds[.]" *Eylicio-Montoya*, 70 F.3d at 1164. So, because the warrant authorizing the search resulted in defendants detaining plaintiff, she may assert a § 1983 claim based on the allegedly unlawful warrant even though plaintiff lacked a reasonable expectation of privacy in the *Record*'s office. *See Olson v. Oreck*, No. CIV-S-06-2064-MCE-CMK, 2008 WL 149976, at *9 (E.D. Cal. Jan. 14, 2008) ("[D]etention during the execution of a *valid* warrant is not actionable under § 1983, detention during execution of an *invalid* warrant may be." (emphasis in original)). The court rejects defendants' standing arguments.

Next, the court analyzes defendants' assertion of qualified immunity.

### 2.  Qualified Immunity

Cody, Hudlin, and Christner all assert qualified immunity against plaintiff's Fourth Amendment claim. Hudlin deserves qualified immunity. Christner and Cody do not. Before

explaining these conclusions, the court provides a brief overview of the law governing detentions during a search warrant's execution.

### a. Law on Detentions

In *Michigan v. Summers*, the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981) (footnotes omitted). The Court since has clarified the expansive nature of this authority: "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Summers*, 452 U.S. at 705 n.19). Also, *Summers* seemingly limited its holding to warrants "founded on probable cause[.]" *Id.* at 692. Indeed, the Tenth Circuit has distinguished *Summers* and *Muehler* when the validity of the warrant is disputed. *Harman v. Pollock*, 446 F.3d 1069, 1086 (10th Cir. 2006); *see also Marks v. Clarke*, 102 F.3d 1012, 1032 (9th Cir. 1996) ("[*Summers*] would not, however, authorize detaining the occupants in furtherance of an illegal search[.]").

With that framework in mind, the court turns to the allegations against the three surviving individual defendants, starting with Acting Chief Hudlin.

### b. Acting Chief Hudlin

Acting Chief Hudlin deserves qualified immunity on both prongs.

*First*, plaintiff hasn't shouldered her burden to allege facts that demonstrate that Hudlin committed a constitutional violation of her rights. The Amended Complaint doesn't allege that Hudlin was involved in procuring the warrant in any manner. *See generally* Doc. 29. Nor does the Amended Complaint allege any reason why Hudlin should have doubted the validity of the

warrant. *See generally id.* So, Hudlin isn't liable for any constitutional violation based on procuring the warrant.

The Amended Complaint's allegations about Hudlin's involvement in executing the warrant are limited. Plaintiff alleges that Hudlin "played a large role in the raids," Doc. 29 at 25 (Am. Compl. ¶ 187), and that Hudlin participated in the "show of force against the *Record* and its staff," *id.* at 10 (Am. Compl. ¶¶ 73–74). Viewing these allegations in the light most favorable to plaintiff, the court assumes plaintiff claims that Hudlin helped detain plaintiff. But even that doesn't mean that Hudlin violated the Constitution. "[T]he law does not require police officers to second-guess a judicial determination that probable cause supports a search warrant." *Wigley v. City of Albuquerque*, 567 F. App'x 606, 610 (10th Cir. 2014); *see also Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]"). So, Hudlin could rely reasonably on the validity of the search warrant.

Because Hudlin reasonably could have believed that the warrant was valid, he didn't violate the Fourth Amendment in executing the warrant. Our Circuit resolved a similar issue in *Wigley*. 567 F. App'x 606. There, officers procured "a search warrant for the home of plaintiffs" and detained plaintiffs while executing the search. *Id.* at 607–08. Notwithstanding the plaintiffs' challenge of the warrant's validity, *Wigley*—citing *Muehler* and *Summers*—explained that the defendant-officer "was entitled to rely [on the warrant] to detain plaintiffs[.]" *Id.* at 610. So, the court concluded that the warrant's validity was "immaterial" and the officer didn't commit a constitutional violation. *Id.* at 610–11. The same logic applies here. As far as Hudlin knew, a valid warrant issued by a neutral judicial officer authorized the search. And

*Muehler* and *Summers* furnished authority to detain the occupants of the *Record*'s office during the search. Plaintiff thus has failed to shoulder her burden on the first prong of the qualified immunity analysis.

*Second*, even if Hudlin committed a constitutional violation, he didn't violate clearly established law. As explained, Hudlin didn't have any reason to question the warrant's validity or his authority to detain plaintiff while searching pursuant to that warrant. The allegation that Cody and Christner lied on the warrant application doesn't mean that Hudlin should have questioned the warrant or would have known to do so. So, Hudlin didn't violate clearly established law and qualifies for qualified immunity. *See Marks*, 102 F.3d at 1028 ("Notwithstanding the warrant's invalidity, appellants who searched the various plaintiffs are nevertheless entitled to rely on the warrant, and will not be stripped of qualified immunity, so long as their reliance is objectively reasonable." (citing *United States v. Leon*, 468 U.S. 897, 920–21 (1984))).

Plaintiff's effort to distinguish *Summers* misses the mark. She argues that *Summers* didn't decide whether authority to detain incident to a search also applies to a search merely seeking evidence (as opposed to contraband). Doc. 52 at 13 (citing *Summers*, 452 U.S. at 705 n.20). Even if officers lack authority to detain occupants of a premise while executing a search warrant for evidence there (a dubious proposition), the law wasn't clearly established on that point, and Hudlin still deserves qualified immunity. The court thus dismisses plaintiff's Fourth Amendment claim against Hudlin.

Plaintiff's claims against Chief Cody and Detective Christner fare better, however. The court explains why, next.

### c. Former Chief of Police Cody

Unlike Hudlin, Chief Cody's reliance on the warrant's validity to detain plaintiff wasn't objectively reasonable. According to the Amended Complaint, Cody knowingly or recklessly included false information in the search warrant application that was material to the magistrate judge's probable cause determination. Doc. 29 at 13–15 (Am. Compl. ¶¶ 93–105). Taking that allegation as true, Cody couldn't have believed reasonably that he was executing a lawful search. So, he didn't have authority to detain plaintiff under *Summers* and *Muehler*. *See Marks*, 102 F.3d at 1032 ("[*Summers*] would not, however, authorize detaining the occupants in furtherance of an illegal search[.]"); *Harman*, 446 F.3d at 1086 ("[I]n neither [*Summers* nor *Muehler*] was the validity of the underlying warrant at issue."). And to the extent that Cody relied on those cases to detain plaintiff, his reliance was objectively unreasonable. *Cf. Marks*, 102 F.3d at 1028 ("Notwithstanding the warrant's invalidity, appellants who searched the various plaintiffs are nevertheless entitled to rely on the warrant, and will not be stripped of qualified immunity, so long as their reliance is objectively reasonable." (citing *Leon*, 468 U.S. at 920–21)).

For the same reason, Cody doesn't qualify for qualified immunity. In 2023, it was clearly established that "[w]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (emphasis in original) (quotation cleaned up). And likewise, it was "'clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause.'" *Turner v. Lotspeich*, 77 F.3d 493, 1996 WL 23195, at *2 (10th Cir. 1996) (quotation cleaned up) (quoting *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991)).

Former Chief Cody thus doesn't deserve qualified immunity and the court declines to dismiss plaintiff's Fourth Amendment claim against him on that basis.

### d. Detective Christner

Detective Christner, too, is plausibly liable for plaintiff's detention. Christner, employed in the Sheriff's Office, offers arguments on both prongs of the qualified immunity analysis. *First*, he argues that he didn't "detain[], approach[], or question[]" plaintiff. Doc. 39 at 10. And *second*, Christner argues that he didn't violate clearly established law. Doc. 39 at 12–16. The court isn't persuaded by either argument.

Christner's first argument ignores the allegation that Christner helped Cody procure the warrant. Plaintiff alleges that Christner drafted the warrant application. Doc. 29 at 13, 15 (Am. Compl. ¶¶ 93, 102). She also alleges that Christner and Cody included multiple false statements in the application. *Id.* at 13–15 (Am. Compl. ¶¶ 95–101). And the Amended Complaint alleges that Christner "either knew the statements made in the applications were false or acted with reckless disregard for whether they were false." *Id.* at 15 (Am. Compl. ¶ 102). Christner characterizes these allegations as "conclusory" and "unsupported[.]" Doc. 39 at 13. The court disagrees. These are factual allegations. And viewing these allegations in the light most favorable to plaintiff, a factfinder could find or infer that Christner bore responsibility for the warrant's falsehoods.

Because it's plausible that Christner knowingly or recklessly included false information in the warrant application, plaintiff's Fourth Amendment claim against him is also plausible. That's so because the false statements in the warrant application "'set in motion a chain of events that [he] knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Mink*, 613 F.3d at 1001 (quoting *Snell*, 920 F.2d at 700). *Mink* demonstrates this point. There, our Circuit held that a plaintiff could hold a district attorney

liable for a search of his home because the district attorney had reviewed and approved an unlawful warrant. *Id.* at 1002–03. The district attorney's "approval set in motion a series of events that she knew or reasonably should have known would cause others to deprive [plaintiff] of his rights." *Id.* at 1003. This same principle applies here as well. Christner should have known that including false information on a warrant application would cause others to violate the *Record* and its staff members' rights. So, the court rejects Christner's position that he isn't liable because he didn't detain plaintiff personally. *See Dodds*, 614 F.3d at 1195 ("Individual liability under § 1983 . . . is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." (quotation cleaned up)).[8]

Christner's arguments on the second prong of the qualified immunity analysis are no more persuasive. As already explained, in 2023 the prevailing law clearly had recognized that the Fourth Amendment requires truthfulness in warrant applications. *See Franks*, 438 U.S. at 164–65. And it was "'clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause.'" *Turner*, 1996 WL 23195, at *2 (quotation cleaned up) (quoting *Bruning*, 949 F.2d at 357).

---

[8]    Our court reached a different conclusion about Christner's liability in *Herbel*. 2024 WL 4416849, at *16. Critically, the complaint there didn't allege that Christner recklessly or knowingly had included false statements in the warrant affidavit. *Id.* (explaining that "there are no allegations that Christner . . . knew of any misstatements by Cody"); *see also* Complaint, *Herbel*, No. 24-cv-2224-HLT-GEB, ECF No. 1, at 31–32 (Compl. ¶¶ 189–91). Here, in contrast, the Amended Complaint explicitly alleges that Christner knowingly or recklessly included false information in the warrant affidavit. Doc. 29 at 29 (Am. Compl. ¶¶ 102–03).

Christner not signing the warrant affidavit complicates the qualified-immunity inquiry. Still, the court concludes that Christner isn't entitled to qualified immunity at this stage for three reasons.

*First*, the Amended Complaint alleges Christner knowingly or recklessly included false information in the affidavit he drafted.  Doc. 29 at 29 (Am. Compl. ¶¶ 102–03).  So even if Christner was relying on Cody's directions, his actions weren't objectively reasonable if he knew—or recklessly disregarded the possibility—that the statements he included in the warrant weren't true.  *See Robitaille*, 175 F. Supp. 3d at 1305–06 (rejecting officer defendant's position that he reasonably could rely on fellow officers' observations when defendant had reason to question veracity of those observations); *see also Montoya v. City and County of Denver*, No. 16-cv-01457-JLK, 2021 WL 1244264, at *17 (D. Colo. Mar. 4, 2021) (rejecting officer defendant's argument that "he was just the messenger" where evidence he included in warrant affidavit was "obviously false"), *aff'd*, No. 21-1107, 2022 WL 1837828 (10th Cir. June 3, 2022).

*Second*, because Christner prepared the bulk of the affidavit and allegedly knew that much of its information was false, he should have known that probable cause didn't support the search warrants.  *See Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005) ("[L]iability under *Malley* may lie . . . against . . . an officer who actually prepares the warrant application . . . . Such an officer is in a position to see the whole picture, to understand his responsibility, and thus fully to assess probable cause questions.").  In other words, as alleged, Christner knew—or should have known—that the warrant affidavit he drafted failed to support even arguable probable cause.  Still, he went forward.

*Third*, the court must accept plaintiff's allegations as true and view them in the light most favorable to plaintiff.  *Brooks*, 985 F.3d at 1281.  Perhaps evidence will emerge that Christner

merely copied Cody's allegations and had no reason to doubt their veracity.  But that's not what plaintiff has alleged.  Should plaintiff fail to muster evidence for her allegations about Christner's culpability, it seems likely he'll prevail at summary judgment.  But at the current stage, the court must view Christner's conduct "as alleged in the complaint[.]"  *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) ("The procedural posture of the qualified-immunity inquiry may be critical. . . . Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." (second ellipsis in original) (internal quotation marks and citation omitted)).

Here's the short of it:  Plaintiff has alleged plausibly that Christner violated clearly established law by knowingly or recklessly including false statements in the warrant application that he drafted.  When that warrant issued, it caused others to violate plaintiff's constitutional rights.  So, the court won't dismiss plaintiff's Fourth Amendment claim against Christner.

The court analyzes plaintiff's conspiracy allegations, next.

**D.  Conspiracy**

Plaintiff's claim in Count V asserts a § 1983 conspiracy among the individual defendants. Doc. 29 at 32 (Am. Compl.) (Count V).  The court explains the governing law on § 1983 conspiracies.  It then applies that law to the facts that plaintiff alleges.

### 1.  Law on § 1983 Conspiracies

A § 1983 "'conspiracy claim allows for imputed liability[.]'"  *Bledsoe*, 53 F.4th at 609 (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990)).  That is, a § 1983 conspiracy theory isn't a standalone claim on which a plaintiff may recover.  It requires "'an underlying constitutional deprivation'" for which "'a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy.'"  *Id.*

36

(quoting *Dixon*, 898 F.2d at 1449 n.6).  To prevail on a conspiracy theory under § 1983, "a plaintiff must show 'at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective.'"  *Frasier*, 992 F.3d at 1024 (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (2021)).  The general conspiratorial objective must take the form of "'a common, unconstitutional goal.'"  *Bledsoe*, 53 F.4th at 609 (quoting *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021)); *see also Frasier*, 992 F.3d at 1025 ("[P]roof that defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities— would be inadequate to support a § 1983 conspiracy claim.").

But "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'"  *Id.* (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998)). Instead, our Circuit demands specificity to plead conspiracy.  "A § 1983 plaintiff must 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'"  *Bledsoe*, 53 F.4th at 609 (emphasis in original) (quoting *Robbins*, 519 F.3d at 1250); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of conspiracy claim where "plaintiff failed to allege specific facts showing agreement and concerted action among defendants").

### 2.  Conspiracy Analysis

Here, plaintiff has failed to allege a conspiracy among the defendants.  The county defendants argue that plaintiff hasn't alleged a plausible conspiracy involving an unlawful conspiratorial objective.  Doc. 39 at 16–17.  The city defendants make largely the same argument.  Doc. 41 at 19–20.

Plaintiff disagrees.  Doc. 52 at 14–15; Doc. 53 at 13–14.  She maintains that she needn't plead an express agreement and that the court must view her allegations in the light most favorable to her.  Doc. 53 at 13–14.  She's right about her points in the abstract.  Proof of a conspiracy doesn't require proof of an express agreement.  *Bledsoe*, 53 F.4th at 609.  It's also true that the court must view the allegations in the Amended Complaint "in the light most favorable to plaintiff[.]"  *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019).  But neither of these propositions nudges plaintiff's conspiracy allegation across the plausibility hurdle.

The court agrees that the Amended Complaint fails to set out a "'common, unconstitutional goal'" among the alleged coconspirators.  *Bledsoe*, 53 F.4th at 609 (quoting *Janny*, 8 F.4th at 919).  The Amended Complaint's only reference to an agreement in the Amended Complaint is conclusory.  *See* Doc. 29 at 32 (Am. Compl. ¶ 249) ("As shown by the facts above discussing the detailed coordination of the raid and the motivation of Cody, Mayfield and Soyez (and, by extension, their subordinates), to retaliate against the *Record* and its staff, including Bentz, there was an agreement among Defendants to deprive Bentz of her civil rights and concerted action toward that end.").  The Amended Complaint never alleges "specific facts showing an agreement[.]"  *Tonkovich*, 159 F.3d at 533.  That is, plaintiff hasn't alleged plausibly that defendants reached an agreement to violate plaintiff's—or anyone else's—rights *before* the allegedly unlawful searches and seizures.

To be sure, "because 'direct evidence of an agreement to join a . . . conspiracy is rare, . . . a defendant's assent can be inferred from acts furthering the conspiracy's purpose.'"  *Bledsoe*, 53 F.4th at 609 (ellipses in original) (quotation cleaned up) (quoting *United States v. Edmonson*, 962 F.2d 1535, 1548 (10th Cir. 1992)).  And, as discussed, an express agreement isn't essential. *Id.*  But at the same time, parallel conduct alone can't suffice to support a plausible inference of

conspiracy. *See Frasier*, 992 F.3d at 1025 ("[P]roof that defendants engaged in 'parallel action . . . does not necessarily indicate an agreement to act in concert.'" (ellipses in original) (quotation cleaned up) (quoting *Brooks*, 614 F.3d at 1228)). And here, beyond a single conclusory allegation at the end of her pleading, plaintiff doesn't offer anything more than allegations of parallel conduct. "But the fact that [defendants] were involved in the investigation, however flawed it was, does not indicate a conspiracy existed." *Herbel v. City of Marion*, No. 24-cv-02224-HLT-GEB, 2024 WL 4416849, at *27 (D. Kan. Oct. 4, 2024); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) ("At best, the record shows that Maddox and Neal assisted Carver (and other officers) in investigating . . . . But showing that Maddox and Neal 'conspired' to investigate Skybar, which is lawful and part of their duties as law enforcement officers, is a far cry from showing that Maddox and Neal agreed to fabricate, and then maliciously prosecute Grider for, a bribery crime he did not commit.").

Without an allegation setting out *who* agreed to do *what* and *when* and *how* those actors formed that agreement, the Amended Complaint fails to set out a plausible conspiracy theory. *Cf. Twombly*, 550 U.S. at 565 n.10 (suggesting conspiracy claim failed where complaint alleged "no specific time, place, or person involved"). So, the court dismisses plaintiff's conspiracy theory.

The court now turns to defendants' arguments attacking plaintiff's claims against the municipalities.

### E. Municipal Liability

"A municipality or other local government may be liable under" § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). But municipalities "are responsible only for 'their *own* illegal acts'" and "are not vicariously liable

39

under § 1983 for their employees' actions." *Id.* (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)); *see also George v. Beaver County*, 32 F.4th 1246, 1253 (10th Cir. 2022).

To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).

A plaintiff may establish such municipal policy or custom by alleging facts capable of demonstrating one of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (internal quotation marks, brackets, and citation omitted). Here, plaintiff bases her municipal liability claims on acts of an employee with final policymaking authority. Doc. 52 at 15–16; Doc. 53 at 6–8. Plaintiff's claims against the City of Marion are viable. But her claims against the county municipalities are not. The court now explains why.

### 1. City of Marion

The City argues that plaintiff hasn't alleged "any facts . . . to show an improper policy or custom, deliberate indifference, or causation with respect to the City." Doc. 41 at 21. The court's not persuaded by this perfunctory argument.

A § 1983 plaintiff may hold a municipality liable for actions by a person with "final policymaking authority[.]" *Whitson v. Bd. of Cnty. Comm'rs*, 106 F.4th 1063, 1667 (10th Cir.

2024) ("[W]hen an official takes action over which he or she has final policymaking authority, the policymaker *is* the municipality, so it is fair to impose liability on that entity for that action." (emphasis in original)).  Where a plaintiff alleges that a policy is facially unconstitutional, "'issues of fault and causation'" are ordinarily "'straightforward.'"  *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1240 (10th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question.").  But the "standard to meet the state-of-mind element changes depending on whether the plaintiff alleges that a policy is facially constitutional."  *Velarde v. Bd. of Cnty. Comm'rs*, No. 23-cv-00878-DHU-JMR, 2024 WL 4692158, at *5 n.2 (D.N.M. Nov. 6, 2024) (citing *Hinkle*, 962 F.3d at 1240).  When a "plaintiff bases her claims on a facially lawful policy, then the deliberate indifference standard applies."  *Velarde*, 2024 WL 4692158, at *5 n.2.

Here, plaintiff alleges that former Chief Cody acted in a facially unlawful manner.  As already explained, she has alleged plausibly that Cody violated her First and Fourth Amendment rights by retaliating against the *Record* and its employees and unlawfully detaining her pursuant to a warrant that he allegedly lied to procure.  The City concedes that Cody had final policymaking authority, Doc. 55 at 4.  This concession satisfies the "municipal policy or custom" requirement.  *Bryson*, 627 F.3d at 788.  And on the allegations, he acted in a facially unlawful manner, which satisfies the fault and causation requirements.  *Hinkle*, 962 F.3d at 1240.  So, plaintiff's claims against the City are plausible.

### 2.  County of Marion

Plaintiff's claims against the county municipalities (the Board of County Commissioners for Marion County and Sheriff Soyez, in his official capacity) aren't viable.  That's so because

the court already has concluded that Soyez didn't violate plaintiff's constitutional rights.  And

while it's true that plaintiff has alleged a plausible claim against one of Soyez's deputies,

plaintiff hasn't alleged any reason that Soyez—or any other county employee with final

policymaking authority—knew or should have known that Deputy Christner would violate

plaintiff's constitutional rights.  Without that kind of allegation, plaintiff can't hold the county

municipalities liable.

Plaintiff argues that Soyez ratified Christner's allegedly illegal conduct by throwing a

pizza party after the raids.  Doc. 53 at 8.  This argument fails for two reasons.  *First*, plaintiff

hasn't alleged any fact capable of supporting a finding that Soyez knew that Christner lied on the

warrant application, so his pizza party couldn't have ratified Christner's allegedly unlawful

conduct.  And *second*, to incur liability based on ratification, the "final decisionmakers' approval

must precede the violative action, and the Tenth Circuit has rejected ratification based on

conduct after the violation has occurred."  *Estate of Burnett v. City of Colorado Springs*, 616 F.

Supp. 3d 1111, 1130 (D. Colo. 2022) (citing *Cordova*, 569 F.3d at 1194).

Finally, plaintiff argues that Soyez was in contact with Cody during the raids.  Doc. 53 at

7.  This argument also falls short of what's required.  True, plaintiff alleges that Soyez told Cody

to seize the *Record*'s electronic equipment.  Doc. 29 at 11 (Am. Compl. ¶ 82).  But plaintiff

never explains how that direction caused plaintiff's detention, interrogation, or separation from

property.  And without a causal connection to plaintiff's injuries, the county can't incur liability.

*See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) ("To

establish the causation element, the challenged policy or practice must be closely related to the

violation of the plaintiff's federally protected right." (internal quotation marks and citation

omitted)); *see also Herbel*, 2024 WL 4416849, at *25 ("If Soyez did not cause any constitutional

violation, the county cannot be liable based on his role as a final policymaker.").

In sum, plaintiff hasn't alleged a plausible claim for municipal liability based on any of

Soyez's actions, because Soyez didn't violate or cause anyone else to violate plaintiff's

constitutional rights.  The court thus dismisses plaintiff's § 1983 claims against the Board of

County Commissioners and against Soyez, in his official capacity.

### F.  Privacy Protection Act

Plaintiff also asserts a Privacy Protection Act (PPA) claim against the City of Marion, the

Board of County Commissioners of Marion County, and Sheriff Soyez.  The PPA "creates a

right of action for the improper seizure of media materials[.]"  *Mink v. Suthers*, 482 F.3d 1244,

1257 (10th Cir. 2007).

> Notwithstanding any other law, it shall be unlawful for a government officer or
> employee, in connection with the investigation or prosecution of a criminal offense,
> to search for or seize any work product materials possessed by a person reasonably
> believed to have a purpose to disseminate to the public a newspaper, book,
> broadcast, or other similar form of public communication, in or affecting interstate
> or foreign commerce; but this provision shall not impair or affect the ability of any
> government officer or employee, pursuant to otherwise applicable law, to search
> for or seize such materials, if . . . there is probable cause.

*Id.* (ellipsis in original) (quoting 42 U.S.C. § 2000aa(a)).  In addition to protecting "work product

materials," the PPA also applies to "documentary materials."  42 U.S.C. § 2000aa(b).[9]

The county defendants offer three arguments against plaintiff's PPA claim.  *First*, they

argue that a PPA cause of action isn't available to plaintiff because she neither possessed nor

controlled any of the materials that officers searched and seized.  Doc. 39 at 18.  Their Reply

recasts their argument and asserts that plaintiff lacks Article III standing to pursue a PPA claim.

---

[9]       The court assumes that plaintiff's PPA claim against Sheriff Soyez is in his official capacity
because the "PPA by its terms does not authorize a suit against municipal officers or employees in their
individual capacities."  *Davis v. Gracey*, 111 F.3d 1472, 1482 (10th Cir. 1997) (emphasis omitted).

Doc. 54 at 5.  *Second*, they argue that plaintiff doesn't allege that defendants searched or seized any work product materials.  Doc. 39 at 18.  *Last*, they contend that Cody initiated the searches with probable cause, which vitiates plaintiff's PPA claim.  *Id.*

The City makes three arguments, too.  *First*, it argues that officers were searching for evidence of a crime, which doesn't qualify as a work product material or documentary material under the PPA.  Doc. 41 at 22–23.  *Second*, plaintiff didn't possess the materials at issue and thus she can't bring a PPA claim.  *Id.* at 23.  And *last*, officers had probable cause that criminal activity was afoot and thus didn't violate the PPA.  *Id.*

Because it's a jurisdictional issue, the court starts (and ends) with Article III standing. The county defendants argue—but only for the first time in their Reply—that plaintiff lacks Article III standing to assert a PPA claim.  Ordinarily, courts don't consider arguments raised for the first time in a reply brief.  *Bordertown, LLC v. AmGUARD Ins. Co.*, No. 22-cv-01683-REB-GPG, 2022 WL 17538186, at *2 (D. Colo. Oct. 5, 2022) (collecting cases to demonstrate courts in our Circuit routinely refuse to consider arguments first presented in a reply brief).  But because the argument raises concerns about subject matter jurisdiction, the court must consider it.  *See Rector v. City and County of Denver*, 348 F.3d 935, 942 (10th Cir. 2003) ("Standing . . . raises jurisdictional questions and we are required to consider the issue *sua sponte* to ensure that there is an Article III case or controversy before us." (internal quotation marks and citation omitted)).

Plaintiff lacks Article III standing to assert her PPA claim.  The court must "'address standing on a claim-by-claim basis.'"  *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021) (quoting *Santa Fe. All. For Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021)).  So, just because plaintiff has alleged constitutional injuries doesn't mean she

has standing to assert this statutory claim. The issue, then, is whether plaintiff suffered a "concrete harm" when defendants allegedly violated the PPA. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "No concrete harm, no standing." *Id.*

The Supreme Court has explained that "certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. But certain "intangible harms can also be concrete." *Id.* Injuries "with a close relationship to harms traditionally recognized as providing a basis for lawsuits" such as "reputational harms, disclosure of private information, and intrusion upon seclusion" satisfy Article III's concrete-harm requirement. *Id.* So, too, do violations of constitutional rights. *See id.*; *Day*, 500 F.3d at 1137. But the mere violation of a statutory right can't confer standing. *TransUnion LLC*, 594 U.S. at 425 ("[T]his Court has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

Here, the Amended Complaint fails to allege a concrete harm flowing from a violation of the PPA, so plaintiff lacks standing to assert this claim. The Amended Complaint alleges the following injuries resulted from the PPA claim:

- "Plaintiff 'is a person aggrieved by a search for or seizure of materials in violation of' the Act." Doc. 29 at 31 (Am. Compl. ¶ 238).

- "The actions that law enforcement took in violation of the Privacy Protection Act resulted in Bentz being unlawfully detained, having her cellphone illegally seized, and being interrogated by police." *Id.* (Am. Compl. ¶ 239).

- Plaintiff "is now suffering from mental and emotional anguish, a loss of sleep, deteriorated social relationships, and aggravated health conditions." *Id.* at 31–32 (Am. Compl. ¶ 240).

None of that is enough.  *First*, plaintiff's assertion that she was aggrieved is conclusory with no underlying factual support.  *Second*, the alleged violation of the PPA—searching and seizing the *Record*'s computers and servers—didn't violate *plaintiff's* constitutional rights.  Yes, defendants seized plaintiff before and during their raid.  But the statutory violation that plaintiff asserts—a search and seizure of work product and documentary materials—didn't violate plaintiff's constitutional rights.[10]  *Third*, plaintiff's emotional injuries alone aren't sufficient to confer Article III standing.  *See Cooper v. US Dominion, Inc.*, No. 22-1361, 2023 WL 8613526, at *5 (10th Cir. Dec. 13, 2023) ("[P]laintiffs' asserted confusion and emotional distress is insufficient to establish an injury for Article III standing.").

Finally, the intangible harm plaintiff allegedly suffered lacks "'a close historical or common-law analogue[.]'"  *Lupia*, 8 F.4th at 1191 (quoting *TransUnion LLC*, 594 U.S. at 424).  Inclusion upon seclusion—a tort courts "readily recognized" at common law—protects against defendants who intrude into "the private solitude of another."  *Id.*  The search and seizure of the *Record*'s computers and servers didn't encroach *plaintiff's* solitude.  *Cf. Seale v. Peacock*, 32 F.4th 1011, 1020–21 (10th Cir. 2022) (holding plaintiff had standing for Stored Communications Act claim because he alleged "an invasion of privacy" when defendant "intentionally accessed *his*" online account (emphasis added)).  So, any abstract and intangible injury plaintiff suffered by defendants' invasion of others' computers and phones lacks the "close historical or common-law analogue" required to confer Article III standing.  *Lupia*, 8 F.4th at 1191 (internal quotation marks and citation omitted).

---

[10]    The Amended Complaint clarifies that plaintiff just used her phone for personal matters.  Doc. 29 at 18 (Am. Compl. ¶ 133).  That means that defendants didn't violate the PPA when they seized it.  Plaintiff thus bases her PPA claim on defendants searching and seizing content in the phones and computers of her employer and her coworkers.

In short, plaintiff didn't suffer a concrete harm when defendants allegedly searched and seized her employer's computers and servers. Plaintiff thus lacks standing to assert a claim based on that statutory violation, and the court lacks jurisdiction to adjudicate it. The court thus dismisses plaintiff's PPA claim without prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) (explaining that district court must dismiss without prejudice when the court bases dismissal on lack of jurisdiction).[11]

## IV.    Motion to Supplement

After briefing on defendants' Motions to Dismiss was complete, plaintiffs filed a Motion to Supplement (Doc. 57). This motion seeks leave to file a brief on the issue whether the court should dismiss claims here with or without prejudice. Doc. 57 at 3. The court denies plaintiff's motion to file additional papers.

"Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply." *Hampton v. Barclays Bank Del.*, 478 F. Supp. 3d 1113, 1142 (D. Kan. 2020) (citing D. Kan. Rule 7.1(a), (c)), *aff'd on other grounds*, No. 20-3175, 2021 WL 3237082 (10th Cir. July 30, 2021). "'Surreplies are not typically allowed.'" *Id.* (quoting *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006)). Plaintiffs haven't cited any exception to this general rule that would permit them to file an additional brief on the present motions. The court denies plaintiff's Motion for Leave to File a Supplemental Response (Doc. 57).

---

[11]    The county defendants argue in a footnote that plaintiff's claims against the Board of County Commissioners and Sheriff Soyez, in his official, duplicate each other. Doc. 39 at 4 n.4. Because the court dismisses all claims against these parties, it needn't reach this argument.

## V.        Dismissal Without Prejudice

Finally, the court must determine whether the claims dismissed by this Order are dismissed with or without prejudice.  It's a close call.  The court is skeptical that plaintiff could cure the shortcomings that led the court to dismiss certain claims.  Plaintiff is represented by experienced counsel.  So, one would imagine—if plaintiff had the ability to plead facts that'd cure the alleged shortcomings of her Amended Complaint—she promptly would have filed a motion to amend.  Plaintiff didn't.

The way this case could unfold troubles the court.  Defendants filed their motions nine months ago.  Plaintiff chose to litigate those motions on the merits instead of seeking leave to amend at any point before the court published this Order.  Amending after the court adjudicates a motion to dismiss represents a "wait-and-see approach[,]" which undermines judicial efficiency. *Herbel*, 2024 WL 4416849, at *28 n.33 (internal quotation marks omitted).  And the court wonders how any proposed amendment wouldn't represent an undue delay.  *See Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (explaining that "denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay" (quotation cleaned up)); *Castanon v. Cathey*, 976 F.3d 1136, 1145 (10th Cir. 2020) ("Unexplained delay alone justifies the district court's discretionary decision [to deny leave to amend]." (quotation cleaned up)).

Still, the court concludes that it must dismiss plaintiff's claims without prejudice. Whether to dismiss with prejudice is a matter committed to the court's discretion.  *Seale*, 32 F.4th at 1027.  *But see id.* (explaining that the Circuit reviews de novo whether "leave to amend would be futile" (quotation cleaned up)).  A "'dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'"  *Id.* (emphasis in original) (quoting *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180,

1190 (10th Cir. 2014)).  But how can the court discern whether amendment is futile without a

proposed amendment before it?  *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th

Cir. 1994) ("We do not require district courts to engage in independent research or read the

minds of litigants to determine if information justifying an amendment exists.").  Our Circuit's

precedent suggests that the court should err on the side of dismissing without prejudice.  *See id.*

("[W]here the record clearly reflects that the non-moving party possesses additional facts

necessary for an amendment and where that party has repeatedly expressed a willingness to

amend, the court should reserve to the non-movant leave to amend upon dismissal of the

action."); *Seale*, 32 F.4th at 1029 (suggesting that dismissal with prejudice is appropriate only

where claim's failure is "patently obvious"); *see also* 6 Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1487 (3d ed. 2024) ("If a proposed amendment is not clearly

futile, then denial of leave to amend is improper." (quoted and cited approvingly in *Seale*, 32

F.4th at 1029)).  *But see Seale*, 32 F.4th at 1028 (affirming dismissal with prejudice where

pleading didn't "support the necessary elements" of the claim).

    This Order's Rule 12(b)(6) dismissals are based on insufficient allegations, qualified

immunity, and in some cases, both.  So, the court can't conclude that it's "patently obvious" that

amendment "would be futile."  *Knight*, 749 F.3d at 1190 (quotation cleaned up).  The court thus

makes this Order's dismissals ones without prejudice.  If plaintiff properly can plead facts to cure

her claims' shortcomings, she must seek leave to amend within 20 days of this Order.[12]  And that

---

[12]    A footnote in each of plaintiff's Response briefs requests leave to amend "[s]hould the [c]ourt
determine that Bentz's Amended Complaint fails, in whole or in part[.]"  Doc. 53 at 5 n.1; *see also* Doc.
52 at 16 n.2.  The court denies these passing requests.  Our Circuit has explained that a "district court may
deny leave to amend when 'a plaintiff fails to file a written motion and instead merely suggests she should
be allowed to amend if the court concludes her pleadings are infirm.'"  *Johnson v. Spencer*, 950 F.3d 680,
721 (10th Cir. 2020) (quotation cleaned up) (quoting *Warnick v. Cooley*, 895 F.3d 746, 755 (10th Cir.
2018)).  That's so because "a bare request to amend in response to a motion to dismiss is insufficient to
place the court and opposing parties on notice of the plaintiff's request to amend and the particular

request must strictly comply with our local rule, D. Kan. Rule 15.1.  Should plaintiff fail to file a motion for leave to amend within 20 days of this Order, the Rule 12(b)(6) dismissals will convert to dismissals with prejudice.[13]

## VI.    Conclusion

The court dismisses the following claims:

- plaintiff's First Amendment prior restraint claim (because plaintiff lacks standing);

- all claims against Sheriff Soyez;

- all claims against former Mayor Mayfield;

- all claims against Acting Chief Hudlin;

- plaintiff's § 1983 conspiracy theory;

- all claims against the Board of County Commissioners of Marion County, Kansas; and

- plaintiff's Privacy Protection Act claim (because plaintiff lacks standing).

Plaintiff's other claims survive.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Aaron Christner; Board of County Commissioners of Marion County, Kansas; and Jeff Soyez's Motion to Dismiss (Doc. 38) is granted in part and denied in part, as set forth above.  The court directs

---

grounds upon which such a request would be based." *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014).  Consistent with this guidance from the Circuit, our court routinely denies such passing requests for leave to amend.  *E.g.*, *Cortishae-Eier v. Ford Motor Co.*, No. 23-3081-EFM-TJJ, 2023 WL 5625311, at *5 (D. Kan. Aug. 31, 2023); *Eravi v. City of Lawrence*, No. 23-CV-4109-JAR-GEB, 2024 WL 3360447, at *5–6 (D. Kan. July 9, 2024); *Orchestrate HR, Inc. v. Blue Cross Blue Shield Kan.*, No. 19-CV-4007-HLT-TJJ, 2021 WL 1238254, at *6 (D. Kan. Apr. 2, 2021); *Vestring v. Halla*, 920 F. Supp. 2d 1189, 1193 (D. Kan. 2013).  Plaintiff must comply with D. Kan. Rule 15.1 if she wishes to amend her operative pleading.  *Eravi*, 2024 WL 3360447, at *5.

[13]    The court is mindful of *Herbel*'s decision to dismiss claims in that case with prejudice.  2024 WL 4416849, at *28 n.33.  The efficiency interest in that approach has some serious Rule 1 appeal.  But the pleading context of *this case* differs, so the court reads our Circuit's precedent to suggest that dismissal without prejudice here is the better outcome.  Still, it's a close call.

the Clerk to terminate as defendants Jeff Soyez and the Board of County Commissioners of Marion County, Kansas, from this case.

**IT IS FURTHER ORDERED THAT** defendants Gideon Cody; Zach Hudlin; the City of Marion, Kansas; and David Mayfield's Motion to Dismiss (Doc. 40) is granted in part and denied in part, as set forth above. The court directs the Clerk to terminate as defendants David Mayfield and Zach Hudlin from this case.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Leave to File a Supplemental Response (Doc. 57) is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of March 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**